## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Chapter 7 |
| | Bky. No. 22-60172 (MER) |
| Travis L. Burg, | |
| Debtor. | |

| | |
|---|---|
| Tony and Rachel Thoennes, | Adv. No. 22-06011 |
| Plaintiffs, | |
| v. | |
| Travis L. Burg, | **PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Defendant. | |

Pursuant to the Amended Order for Trial and for Use of Electronic Evidence dated May 9, 2023 [Dkt. No. 20], Plaintiffs Tony and Rachel Thoennes ("Plaintiffs") hereby submit their proposed findings of fact and conclusions of law.

## **FINDINGS OF FACT**

1.      Plaintiffs Tony Thoennes and Rachel Thoennes are individuals who reside in the State of Minnesota.  They are also husband and wife.

2.      The Plaintiffs formed Birchwood Electric, Inc. ("Birchwood Electric") in 2005 and formed Birchwood Technology, Inc. ("Birchwood Technology")  in 2012 (together, "Birchwood").  (Stip. Facts ¶ 2).  Birchwood provided electrical contractor services for new and existing residential homes.  (Stip. Facts ¶ 2).

3.      While the Plaintiffs owned Birchwood, Tony Thoennes served as the fulltime master electrician and received an annual salary of $60,000 as of December 31, 2013. (Stip. Facts

¶ 3). Rachel Thoennes served as the full-time officer manager and was responsible for billing and the daily operations of the businesses. (Stip. Facts ¶ 3). Rachel Thoennes received an annual salary of $50,000 as of December 31, 2013. (Stip. Facts ¶ 3).

4. The Debtor is an individual who resides in the State of Minnesota. The Debtor is married to Nicole Burg ("Nikki Burg") and has three minor children with the initials T.B. (age 13), T.B. (age 12), and B.B. (age 9) (collectively, the "Burg children").

5. In 2011, Birchwood hired the Debtor as an office employee with responsibilities involving scheduling Birchwood's employees. (Stip. Facts ¶ 5),

6. Prior to joining Birchwood, the Debtor received a two-year degree from Alexandria Technical College in a telecommunication and network technology related field. (Stip. Facts ¶ 6). Through his course of study, the Debtor received a license to perform low voltage electrical work. Before joining Birchwood, the Debtor worked for several businesses over the course of ten years selling phones and installing satellite dishes. (Stip. Facts ¶ 6).

7. While employed by the Plaintiffs, the Debtor utilized his low-voltage electrical license to install specialized lights and security monitoring systems through Birchwood Technology. (Stip. Facts ¶ 7).

**A. The Debtor purchases Birchwood Electric and Birchwood Technology from the Plaintiffs for the appraised value of $1.8 million.**

8. In 2013, the Plaintiffs and Debtor began to explore the possibility of selling Birchwood to the Debtor. (Stip. Facts ¶ 8). On January 7, 2014, Brenda Follmuth of Falcon National Bank ("Falcon Bank") engaged Miller, Welle, Heiser & Co., LTD., an accounting firm, to perform an independent valuation appraisal of the business for purposes of determining the value of Birchwood for financing the Debtor's purchase. (Stip. Facts ¶ 8). The accounting firm

2

concluded that the Plaintiffs' stock in Birchwood was worth $1,802,264 as of December 31, 2013. (Stip. Facts ¶ 8; Pls.' Ex. 8).

9.     Two Falcon Bank employees, Brenda Follmuth, a credit analyst, and Roger Hanson, a loan officer, signed and accepted the business valuation on January 17, 2014 and January 18, 2014, respectively, with the following comments:

> This review was completed by a reputable firm by an individual who is certified in Accredited Business Valuation.  Valuation methods used were appropriate and reported in the acceptable Summary Report format.  Reviewer had a few questions upon initial review of the valuation; however, these were adequately answered/explained (see attachments).

(Stip. Facts ¶ 9; Pls.' Ex. 7).

10.     On March 19, 2014, the Debtor purchased all of the Plaintiffs' stock in Birchwood pursuant to a Stock Purchase Agreement (the "SPA") for $1.8 million.  (Stip. Facts ¶ 10; Pls.' Ex. 2).  Per Section 2.A. of the SPA, the Debtor paid the Plaintiffs $878,500 in cash at closing, with the remaining purchase price balance of $921,500 to be paid in monthly installments over ten years pursuant to a Promissory Note (the "Note") executed concurrently with the SPA.  ((Stip. Facts ¶ 10; Pls.' Ex. 3).

11.     The Note provides, in pertinent part, as follows:

> On this 19th day of March, 2014, the undersigned, Travis L. Burg (the "Borrower"), promises to pay to Tony J. and Rachel M. Thoennes (collectively the "Lenders"), the sum of Nine Hundred Twenty One Thousand Five Hundred and 00/100 Dollars ($921,500), together with interest thereon at a rate of Eleven Percent (11.00%) per annum from the date above. Two Hundred Thousand and 00/100 Dollars ($200,000) will be on complete stand by with no interest until the end of the loan term (10 years), at which time the remaining balance will be due [in] full.
> Monthly payments in the amount of Nine Thousand Nine Hundred Thirty Eight and 66/100 Dollars ($9,938.66) shall be made, over a One Hundred Twenty (120) Month Term, until the principal balance, plus interest and full standby has been repaid.

(Stip. Facts ¶ 11; Pls.' Ex. 3).

ACTIVE 687320735v3

12.    The Note also requires the Debtor to pay the Plaintiffs' reasonable attorney's fees upon any payment default: "Should any default occur in the payment set forth above, the undersigned agrees that he shall be responsible for reasonable attorney's fees, together with court costs, if placed in the hand of an attorney for the purposes of collection." (Stip. Facts ¶ 12; Pls.' Ex. 3).

13.    Pursuant to Section 3.D. of the SPA, the Debtor agreed to the following restrictive covenant:

> [S]o long as any amount remains unpaid on the Note[,] . . . [e]xcept for bills, obligations and liabilities incurred in the normal course of affairs and business, and except for the indebtedness to [the Plaintiffs] Contemplated by this Agreement, [the Debtor] will not cause or allow [Birchwood] to create, incur, or assume expenses or indebtedness in excess of Five Thousand Dollars ($5,000.00) in any fiscal year without the prior written consent of [the Plaintiffs].

> [S]o long as any amount remains unpaid on the Note[,] . . . [Birchwood] shall continue to operate as previously operated, substantially in the form and manner as previously operated, and shall not engage in other business activity without the prior written consent of the [Plaintiffs].

(Stip. Facts ¶ 13; Pls.' Ex. 2).

14.    In connection with execution of the SPA and the Note, the Debtor and Birchwood executed a Security Agreement dated March 19, 2014 (the "Security Agreement"), in favor of the Plaintiffs.  (Stip. Facts ¶ 14; Pls.' Ex. 4).

15.    Falcon Bank agreed to finance the remaining sale price of $878,500 and loaned Birchwood $902,000 (the "Falcon Loan") pursuant to a Business Loan Agreement.  (Stip. Facts ¶ 15; Pls.' Ex. 5).  The Falcon Loan was comprised of $878,500 in cash paid to the Plaintiffs at closing, and $23,500 in Falcon Bank's closing fees and costs. The Debtor personally guaranteed the Falcon Loan. (Stip. Facts ¶ 15).

4

16.    As a condition to the Falcon Loan, Falcon Bank required the Plaintiffs and the Debtor to execute a Subordination Agreement dated March 19, 2014 (the "Subordination Agreement").  (Stip. Facts ¶ 16; Pls.' Ex. 6).

17.    Under the Subordination Agreement, the Plaintiffs agreed that until Birchwood and the Debtor repaid the Falcon Loan in full, the Debtor's obligations under the Note and the Plaintiffs' right to exercise remedies under the Note and Security Agreement would be subordinate to the Debtor's obligations to Falcon Bank.  (Stip. Facts ¶ 17).

18.    The Subordination Agreement permitted the Debtor to make the $9,938.66 monthly payments to the Plaintiffs under the Note as long as Birchwood maintained a debt service coverage ratio (the "DSCR") of 1.25x or greater.  Stip. Facts ¶ 18). Under the Business Loan Agreement, the DSCR is "to be measured on a quarterly basis and is prior to distributions, including both the seller carry back and Falcon debt service requirements." (Stip. Facts ¶ 18; Pls.' Ex. 5).

19.    Plaintiffs also provided $280,000 of working capital to Birchwood through existing accounts receivable at the time of closing.  Birchwood repaid the working capital loan over the first 33 months of operations.

20.    In connection with the sale, the Debtor, on behalf of Birchwood, also executed a Lease Agreement with SHMILY Enterprises, LLC, a company owned by the Plaintiffs, to lease a facility for Birchwood's operations in Cold Spring, Minnesota (the "SHMILY Lease Agreement"). (Stip. Facts ¶ 19). The SHMILY Lease Agreement required monthly lease payments of $3,000 for a term of five years.  (Stip. Facts ¶ 19; Pls.' Ex. 27).

21.    As a result of the sale transaction, the Debtor owned 100% of Birchwood Electric and Birchwood Technology. (Stip. Facts ¶ 20).

*ACTIVE 687320735v3*

**B. Beginning in January of 2017, the Debtor Orchestrates a Scheme to Shelter Assets from the Thoennes through Real Estate Transactions with Wade Rodenwald.**

22. From March 2014 through December 2016, the Debtor made all monthly payments to the Plaintiffs under the Note. (Stip. Facts ¶ 21).

23. On December 30, 2016, Dennis Miller, the "Commercial Lender – SBA Lender" at Falcon Bank informed the Debtor that Birchwood had failed to meet the DSCR for two quarters of 2016. Dennis Miller both called and emailed the Debtor to explain that Birchwood must suspend payments to the Plaintiffs because it failed to meet the DSCR. In the email, Dennis Miller explained Birchwood was required to "suspend payments on the Subordinated debt, until we can review your Year-end, 2016 Tax Return. If the debt service coverage ratio is in line at that time, then you can resume the payments to them." (Stip. Facts ¶ 23; Pls.' Ex. 34).

24. From and after receipt of this communication, the Debtor has not paid any amount on the Note. (Stip. Facts ¶ 24).

25. Around this time, the Debtor met with Wade Rodenwald, a high school friend of the Debtor and a real estate agent, who operates numerous limited liability companies involved in "flipping" houses. Wade Rodenwald is listed as a manager, agent, or organizer of at least 9 limited liability companies in Minnesota. (Stip. Facts ¶ 25; Pls.' Ex. 59).

26. At the Debtor's request, in 2016 or early 2017, Wade Rodenwald came to the Debtor's home to look at the Debtor's documents for the purchase of Birchwood. (Stip. Facts ¶ 27). Upon reviewing the documents, Wade Rodenwald told the Debtor that he overpaid for Birchwood. (Stip. Facts ¶ 27; T. Burg Dep. Trans. at 80-82, Mar. 2, 2023).

27. The Debtor and Wade Rodenwald met with an attorney, Peter Donahue, to request assistance with removing Birchwood's obligations to the Plaintiffs. (Stip. Facts ¶ 28). The Debtor explained to the attorney that he bought a business "and we're trying to come up with a solution to

6

get rid of the old owners . . . ." Donahue did not want to assist the Debtor and was not retained. (Stip. Facts ¶ 28; T. Burg Dep. Trans. at 41-42, Mar. 2, 2023).

28.     Instead, the Debtor, on behalf of Birchwood, retained Stinson Leonard Street LLP ("Stinson") to assist Birchwood with its financial obligations related to the Falcon Loan and the Note. (Stip. Facts ¶ 29).  Wade Rodenwald attended the Debtor's meetings at Stinson as a financial consultant and potential investor in Birchwood. (Stip. Facts ¶ 29; T. Burg Dep. Trans. at 79:6-11, Mar. 2, 2023).

29.     On February 7, 2017, the Plaintiffs, the Debtor and Wade Rodenwald met in person at Stinson's office to discuss the monthly payment default. (Stip. Facts ¶ 30).  Rachel Thoennes had computed the outstanding balance as $804,941.26. (Stip. Facts ¶ 30). At the meeting the Debtor stated his belief that he overpaid for Birchwood. (Stip. Facts ¶ 30). The Debtor offered to pay $100,000 in full and final satisfaction of the Note or, alternatively, $50,000 with a 10% profit sharing for 2017-2019. (Stip. Facts ¶ 30). If the Plaintiffs did not accept one of the alternative offers, the Debtor threatened to file for bankruptcy. (Stip. Facts ¶ 30).

30.     On February 8, 2017, the Debtor's attorney sent a settlement offer to the Plaintiffs proposing the above repayment terms. (Stip. Facts ¶ 31). The offer letter reiterated that "Mr. Burg will likely be forced to file for bankruptcy protection" if an agreement was not reached with the Plaintiffs.  (Stip. Facts ¶ 31; Pls.' Ex. 14).

31.     On February 20, 2017, the Plaintiffs countered with an offer to accept $506,422.59, which represented the principal amount due and owing on the Note less the amount of accounts receivable Birchwood had previously paid to the Plaintiffs following the sale of the businesses to the Debtor.  (Stip. Facts ¶ 32; Pls.' Ex. 20).

*ACTIVE 687320735v3*

32.     The Debtor rejected the Plaintiffs' counteroffer on February 22, 2017. (Stip. Facts ¶ 33; Pls.' Ex. 16).

33.     On April 17, 2017, the Plaintiffs met with Wade Rodenwald and the Debtor at Rockville Café to discuss Wade Rodenwald's interest in buying an ownership interest in Birchwood. (Stip. Facts ¶ 34). Wade Rodenwald offered to use his real estate holdings as collateral to get a loan from American Heritage Bank to satisfy the Note. (Stip. Facts ¶ 34; Pls.' Ex. 19).

34.     From April 22, 2017 to May 9, 2017, the Plaintiffs and the Debtor negotiated a payment plan over email that involved a $350,000 lump sum payment and a $100,000 loan at 0% interest for two years. (Stip. Facts ¶ 35). On May 2, 2017, the Debtor emailed Rachel Thoennes responding to the offer "[t]hat sounds good Rachel, accepted.  I will call Chase at American Heritage [Bank] tomorrow and get the process rolling." (Stip. Facts ¶ 35; Pls.' Ex. 19).

35.     The next day, on May 3, 2017, the Debtor met with a Stinson attorney and discussed creating a limited liability company with Wade Rodenwald for the purpose of "flipping" houses. (Stip. Facts ¶ 36; Pls.' Ex. 17). The new company would be owned equally by Wade Rodenwald and the Debtor. (Stip. Facts ¶ 36). Pls.' Exs. 17, 20).

36.     Two weeks after the Debtor's meeting with Stinson, on May 18, 2017, Wade Rodenwald formed Consulting By Wade LLC ("Consulting By Wade") with its principal address at Wade Rodenwald's home in Albany, Minnesota.  (Stip. Facts ¶ 38; Pls.' Ex. 30).

37.     The Debtor subsequently backed out of the negotiated settlement with the Plaintiffs via email on June 9, 2017.

**C. From and after January, 2017, the Debtor manipulates the books and records of Birchwood to stay under the 1.25x DSCR imposed by Falcon Bank – thus avoiding payments to the Plaintiffs.**

38.     The Debtor managed the financial records of Birchwood using the accounting software QuickBooks. Several individuals had access to Birchwood's QuickBooks software: the

8

Debtor; Nikki Burg (the Debtor's spouse); Tahnee Rudolph (an office employee of Birchwood); Nathan Schell (an employee of Birchwood); Peter Allen (master electrician employed by Birchwood); and Bret Garness (an employee of Birchwood). (Stip. Facts ¶ 40).

39.     According to Nikki Burg, Nathan Schell, and Peter Allen, the Debtor was responsible for all billing and invoicing. (Stip. Facts ¶ 70); N. Burg Dep. Trans. at 23, Feb. 21, 2023; N. Schell Dep. Trans. at 35, Feb. 27, 2023; P. Allen Dep. Trans. at 23, Feb. 27, 2023).

40.     Under the Subordination Agreement, the Debtor was permitted to make the $9,938.66 monthly payments to the Plaintiffs under the Note only as long as Birchwood maintained a DSCR of 1.25x or greater. (Pls.' Ex. 2, 6).

### 1. The Debtor manipulates Birchwood's DSCR by transferring money and services from Birchwood to Wade Rodenwald.

41.     Through payments to his friend via Consulting By Wade and free services for Rodenwald and his associated entities, the Debtor began to manipulate the DSCR to increase expenses and underreport revenue to artificially depress the DSCR.

42.     From and after its formation, the Debtor caused Birchwood to pay Consulting By Wade $225,375[1] in consulting fees from July 12, 2017 to April 4, 2022. Birchwood sublet space from Consulting by Wade and paid $105,000. (Stip. Facts ¶ 39; Pls.' Ex. 28). In total, Birchwood paid Consulting By Wade $334,675 from May 2017 to July 2022 for consulting services, rent, and snow plowing. (Stip. Facts ¶ 39; Pls.' Exs. 29, 121 and 125). The Debtor, through Birchwood, and the Debtor's spouse, separately paid Wade Rodenwald an additional almost $44,000 for real estate transactions.

---

[1] $5,000 paid to Consulting By Wade on March 12, 2019 is categorized in QuickBooks as "Professional Fees" but in the memo is described as "Damage Deposit and 1st months Rent."

9

43.     The Debtor eventually began to pay Rodenwald $10,800 per quarter for "consulting" services.  The Debtor could not articulate any value to Birchwood from the "consulting" services.  Nathan Schell, who worked in Birchwood's office, likewise was not aware of any value that Rodenwald brought to Birchwood through his "consulting" services. (N. Schell Dep. Trans. at 19:23, Feb. 27, 2023).

44.     Simultaneously with paying rent to Consulting By Wade, Birchwood also paid an entity the Debtor owned $47,500 for rent of the same location for seventeen months. (Stip. Facts ¶ 61).

45.     Birchwood also would create at least 47 invoices and estimates for Wade Rodenwald's properties that were later deleted.  Each of these invoices and estimates were deleted from QuickBooks from 2017 to 2022. (Pls.' Ex. 348).

46.     Birchwood applied for at least 17 permits for properties listed on the deleted invoices and estimates. (Summary Ex. 6; Pls.' Exs. 182-185; 187; 212-21; 223-24; 230).

47.     According to Peter Allen, a master electrician who worked for Birchwood from 2013 through 2020, Birchwood completed a "significant amount" of work for Wade Rodenwald and his various properties and affiliates. (Stip. Facts ¶ 67; P. Allen Dep. Trans. at 40:7-18, Feb. 27, 2023).  Peter Allen worked on Wade Rodenwald's home as Birchwood's master electrician and testified that work orders were also created for work performed on Wade Rodenwald's rental properties. (Stip. Facts ¶ 67; P. Allen Dep. Trans. at 40:19-25, 41:1-11, Feb. 27, 2023).

48.     Peter Allen, along with other Birchwood employees, performed electrical work at Wade Rodenwald's home through Birchwood. (Stip. Facts ¶ 68).  An estimate of $25,191.15 was created for "Tiff's House that she lets Wade live in," but was not invoiced by Birchwood nor paid. (Stip. Facts ¶ 68). An invoice for Wade Rodenwald's shed in the amount of $23,549.90 was created

10

but never paid. (Stip. Facts ¶ 68). The invoice and estimate were created for separate services and specialty parts provided by Birchwood.  (Stip. Facts ¶ 68; Pls.' Exs. 123-24, 348**)**.

49.     Birchwood paid electrician employees to paint houses owned by Wade Rodenwald and to complete electrical work at properties owned by Wade Rodenwald. (Stip. Facts ¶ 69; P. Allen Dep. Trans. at 41:4-11, 51:15-52:11, Feb. 27, 2023).

50.     Birchwood also paid expenses for parts and permits related to Wade Rodenwald's properties.  (Stip. Facts ¶ 71; Pls.' Ex. 120).

51.     The value of Birchwood's services and parts provided in the deleted estimates and invoices is at least $180,409.71. (Pls.' Ex. 348; Summary Ex. 6). On and after December 16, 2014, Birchwood only received $9,254.34 in payments for work performed on "Rodenwald Rental" properties. (Stip. Facts ¶ 72; Pls.' Ex. 126).  In fact, Rodenwald has paid more to the Debtor since he filed for bankruptcy then he did in 8 years as a customer of Birchwood. (*See* Pls.' Ex. 105).

### 2. The Debtor manipulates Birchwood's DSCR by trading Birchwood's services and transferring Birchwood's assets for his personal benefit.

52.     In 2017, the Debtor and Nikki Burg sold their home and purchased a property to build a new house. (Stip. Facts ¶ 43). The Debtor used St. Rosa Lumber Inc. ("St. Rosa"), H & S Heating and Air Conditioning ("H & S"), Klocker Construction, Bold Image Construction, Inc. ("Bold Image"), and Eddie Opatz as subcontractors. (Stip. Facts ¶ 43). The subcontractors provided lumber, HVAC, construction, framing, concrete and septic services. (Stip. Facts ¶ 43; N. Burg Dep. Trans. at 118-20, Feb. 21, 2023).

53.     Bold Image Construction, Inc. is owned by Nicholas Burg ("Nick Burg"), a second` cousin of the Debtor. Nick Burg also worked for St. Rosa. (Stip. Facts ¶ 44).

*ACTIVE 687320735v3*

54.     Nathan Schell and Peter Allan, each an employee of Birchwood, testified under oath that they worked on Nick Burg's house as employees of Birchwood.  (Stip. Facts ¶ 45; N. Schell Dep. Trans. at 47:17-48:4, Feb. 27, 2023; P. Allen Dep. Trans. at 49:8-50:7, Feb. 27, 2023).

55.     Between August 27, 2019 and March 31, 2020, employees of Birchwood made entries in QuickBooks for $19,235.25 worth of work performed by Birchwood for Nick Burg. (Stip. Facts ¶ 46). The memo of the estimate states "Nick and Savannah."  (Stip. Facts ¶ 46; Pls.' Ex. 232).  The estimate was billed to Nick Burg as invoice 15030 in the amount of $11,228.61, 60% partial billing for "rough-in."  (Stip. Facts ¶ 46; Pls.' Ex. 234).  No final invoice for the remaining 40% was created.  (Stip. Facts ¶ 46; Pls.' Ex. 233).

56.     The invoice for Nick Burg's home was deleted on March 17, 2020. (Stip. Facts ¶ 47; Pls' Ex. 234). The estimate for Nick Burg's home was deleted on May 13, 2021. (Stip. Facts ¶ 47; Pls.' Ex. 235). No payment for invoice 15030 or estimate 6025 was accounted for in Birchwood's QuickBooks accounting system or bank accounts. (Stip. Facts ¶ 47). Seven other estimates and invoices related to Bold Image also were deleted between May 31, 2019 and May 13, 2021.  (Pls.' Ex. 233).

57.     H & S is owned by Jeremy Salzburn.  Birchwood Technology, Inc. provided $12,102 in free services and inventory to Jeremy and Emily Salzburn in 2019 as "TRADE."  (Stip. Facts ¶ 49; Pls.' Exs. 173-75).

58.     Birchwood also paid H & S's invoices related to construction of the Debtor's home. (Stip. Facts ¶ 50). The Debtor accounted for $20,915.06 in payments to H & S by Birchwood as owner's capital draws from the company. (Stip. Facts ¶ 50; Pls.' Ex. 179).

*ACTIVE 687320735v3*

59.     Eddie Opatz owns Opatz Metals and Rolloffs ("Opatz Metals"). (Stip. Facts ¶ 51). Birchwood Technology, Inc. gave Opatz Metals a discount of $3,453.98 for a "dumpster trade" on September 25, 2017. (Stip. Facts ¶ 51; Pls.' Ex. 172).

60.     Colorful Concepts, owned by Jon Boerger, painted the Debtor's home. Birchwood supplied electrical services and parts for wiring a shed for Colorful Concepts in trade for painting the Debtor's home. (Stip. Facts ¶ 52). Four electricians spent 48 hours total at Colorful Concepts on May 9, 2018 and June 6, 2018. (Stip. Facts ¶ 52). An estimate was created for $7,312.98 worth of work and an invoice was created for $1,104.18. (Stip. Facts ¶ 52). No payment was received and the Debtor deleted the invoice on November 16, 2018. (Stip. Facts ¶ 52; Pls.' Exs. 176-78).

61.     The Debtor, through Birchwood, also performed trades or free services for his and Wade Rodenwald's family and friends, including Aaron and Ashley Burg, Sheryl Burg, Judy Bialka, Zach and Rachael Bialka, Kimberly Wentland, Mark MacArthur, Al Scepaniak, Bret Garness, Jerome Tschida, Jim Heckendorf, Century 21, and others. No payment information for work performed for these individuals is accounted for in Birchwood's QuickBooks accounting software and the estimates and invoices were deleted. (Summary Exs. 7-1 – 7-5; Pls.' Exs. 195, 197, 200, 202, 209, 211, 236-37, 241-42, 245-46, 248-55, 349, 351).

62.     Between the deletion of invoices for Rodenwald, the Debtor's home, the Debtor's friends, family and contractors, Birchwood provided in excess of $370,000 in free services that were not accounted for in the revenue of Birchwood and artificially depressed the DSCR. Moreover, the expenses for these jobs (*e.g.,* parts used at on the job site) stayed on the books and records for Birchwood, also depressing the DSCR.

*ACTIVE 687320735v3*

### 3. The Debtor transfers assets and funds from Birchwood to stay under the DSCR and fund real estate "investments" with Wade Rodenwald.

63.     On March 28, 2018, the Debtor and Nikki Burg formed Grubworm LLC ("Grubworm") with its principal executive office at the Debtor and Nikki Burg's home address. (Stip. Facts ¶ 53; Pls.' Ex. 21). The Debtor and Nikki Burg each own fifty percent of Grubworm. (Stip. Facts ¶ 53; N. Burg Dep. Trans. at 93, Feb. 21, 2023).

64.     Grubworm's true purpose was not to earn money for the Debtor. Grubworm lost money. (Summary Ex. 8). Grubworm's primary purpose was to shelter the Debtor's assets—mainly owner's draws from Birchwood—so they were not in the Debtor's name. To shelter assets through Grubworm, the Debtor partnered with his friend Wade Rodenwald and gave Rodenwald control over Grubworm's accounts. Through a series of real estate transactions, the Debtor moved his assets out of his creditors' reach, while Rodenwald profited from Grubworm's losses.

65.     Grubworm maintained a bank account at Randall State Bank ("Randall Bank"), and Wade Rodenwald would deposit and withdraw funds from the account. (Stip. Facts ¶ 56). At the Debtor's continued 341 meeting held on August 17, 2022, the Debtor testified that he allowed Wade Rodenwald to utilize Grubworm to purchase houses and Wade Rodenwald had full access to Grubworm's bank accounts. (Stip. Facts ¶ 56; 341 Trans. at 16-17, Aug. 17, 2022). The Debtor claimed he had no knowledge of the movement of funds to and from his Grubworm accounts. (Stip. Facts ¶ 56; 341 Trans. at 16-17, Aug. 17, 2022).

66.     The Debtor took $1,283,000 in owner's draws from Birchwood prior to filing bankruptcy, and a significant amount of these draws were utilized for purchase of real estate (Summary Ex. 1). The Debtor acknowledged he took money from Birchwood for Grubworm while simultaneously not paying the Plaintiffs under the Note.

*ACTIVE 687320735v3*

67.     The Debtor testified under oath at his 341 Meeting held on July 7, 2022 that Grubworm "just a trenching company that I have. Whenever I do electrical trenches I would just rent myself or Birchwood would rent from Grubworm and then we would do our electrical trenches out of it instead of renting from general rental or whatever." (Stip. Facts ¶ 54; 341 Trans. at 59:18-24, July 7, 2022).

68.     The Debtor did not begin utilizing Grubworm as a trenching company until 2020. (Stip. Facts ¶ 63; Pls.' Ex. 31). Birchwood was Grubworm's only real customer. The Debtor testified that he might have rented his equipment to others outside of his rentals to Birchwood for around $500 a day but he could not recall any other customers. (Stip. Facts ¶ 63; T. Burg Dep. Trans. at 101, 125, Mar. 2, 2023). Nikki Burg also testified that she could not recall any other customers. (Stip. Facts ¶ 63; N. Burg Dep. Trans. at 93, Feb. 21, 2023). No rental payments are reflected in Grubworm's bank account. (Stip. Facts ¶ 63).

69.     From January 3, 2019 to March 4, 2022, Birchwood paid $93,240.19 to Grubworm for trenching services, a vehicle, and rent. (Stip. Facts ¶¶ 62, 64; Pls.' Ex. 31). Of this amount, $47,500.00 was rent of the premises from Consulting By Wade, $4,200.00 was for purchase of a vehicle, and $41,540.19 was for trenching services. (Stip. Facts ¶¶ 62, 64; Pls.' Ex. 31). Approximately $40,000 of these transfers to Grubworm were not deposited into Grubworm's bank account (Pls.' Exs. 331, 335).

70.     After substantial discovery from the Plaintiffs, and contrary to his testimony at the initial 341 meeting, the Debtor admitted at his deposition on March 2, 2023 that he started Grubworm to invest in houses as a means to make additional income. (Stip. Facts ¶ 55; T. Burg Dep. Trans. at 97, 101, Mar. 2, 2023). He testified he would take capital draws from Birchwood

*ACTIVE 687320735v3*

to invest in Grubworm's purchase of houses with Wade Rodenwald's assistance. (Stip. Facts ¶ 55; T. Burg Dep. Trans. at 97-98, 101-102, Mar. 2, 2023).

71.     The Debtor testified at his deposition as follows:

Q. So, you were taking monies out of the company for investment purposes while you were not paying the Thoenneses?

A. Yeah, trying to build an asset company.

(Stip. Facts ¶ 55; T. Burg Dep. Trans. at 191-92, Mar. 2, 2023).

72.     From May 4, 2018 through December 1, 2020, Grubworm borrowed $919,917.61 from Randall Bank across 11 loans. (Stip. Facts ¶ 57; Summary Ex. 9).

73.     The Debtor, Nikki Burg, and Grubworm invested in at least eight houses between 2018 and 2020. (Stip. Facts ¶ 74). Seven were purchased by Grubworm, and the eighth, in Melrose, Minnesota was purchased by the Debtor and Nikki Burg individually. (Stip. Facts ¶ 74). The properties were located at:

a.   330 2nd Street, Albany, MN 56307

b.   211 Main Street North, Sauk Centre, MN 56378

c.   28664 Frontage Road, St. Joseph, MN 56374

d.   108 8th Ave. East, Osakis, MN 56360

e.   4013 9th Street South, Moorhead, MN 56560

f.   24483 412th Street, Freeport, MN 56331

g.   7042 20th Street, Holdingford, MN 56340

h.   44946 Birch Hill Road, Melrose, MN 56301

(Stip. Facts ¶ 74; Summary Exs. 10-1 – 10-8).

74.     According to Stearns County sale and purchase records, the sellers received $333,500 in profit above their purchase price when selling the properties to Grubworm and the

16

Debtor. (Summary Exs. 10-1 – 10-8; Pls.' Ex. 148-51, 256-58). Over the course of eight real estate transactions, Grubworm generated total losses of $111,961 (Summary Ex. 11).

75. The Melrose property was purchased by the Debtor and Nikki Burg on February 14, 2020. (Stip. Facts ¶ 76). The purchase was funded by Birchwood when the Debtor took a $23,000 equity distribution from Birchwood. (Stip. Facts ¶ 76; Pls.' Exs. 63-64). The payment was distributed to Nikki Burg and deposited into her bank account. (Stip. Facts ¶ 76; Pls.' Ex. 337 at 39).

76. At her deposition, Nikki Burg explained that she shared half of the proceeds related to the sale of a property in Melrose, Minnesota with Wade Rodenwald as follows:

Q. Did you own this jointly with Mr. Rodenwald?

A. No.

Q. Why would he get half of the proceeds?

A. We owned it. It was in our name, but he helped make the monthly payments and pay half of the bills.

(Stip. Facts ¶ 77; N. Burg Dep. Trans. at 77, Feb. 21, 2023).

77. Birchwood provided $4,451.77 in labor and materials to the Melrose property. (Stip. Facts ¶ 78). Birchwood charged the invoice as a "Rodenwald Rental" and deleted the invoice without payment on July 2, 2019. (Stip. Facts ¶ 78; Pls.' Ex. 304).

78. Grubworm owned a rental property in Osakis that Rodenwald controlled. Rodenwald's mother-in-law, Christine Higgins, operated as landlord through her company Sunset Lighthouse. (Stip. Facts ¶ 79; Pls.' Ex. 292). Christine Higgins negotiated a rent-to-own contract with the tenant, but would direct decisions regarding the sale of the house through Rodenwald. (Stip. Facts ¶ 79; Pls.' Ex. 291). The rent payments received by Christine Higgins were not deposited into Grubworm's bank account. (Stip. Facts ¶ 79).

ACTIVE 687320735v3

79.     Wade Rodenwald and his affiliates were the only parties to profit from Grubworm's purchase of properties. All of the properties purchased by Grubworm and the Debtor were purchased directly from Wade Rodenwald, an entity controlled by Wade Rodenwald, or a business affiliate of Wade Rodenwald. (Stip. Facts ¶ 81). One of the companies that profited from selling properties to Grubworm was BR-549 LLC, a limited liability company formed by Wade Rodenwald on November 1, 2016 (Pls.' Ex. 33; Summary Ex. 12).

80.     Wade Rodenwald's company, BR-549 LLC, profited on properties for which Birchwood provided services.  In Stearns County, 11 properties were purchased and sold by BR-549 LLC and eight of the properties received services from Birchwood.  (Summary Ex. 12; Pls.' Exs. 215, 225-227, 347-348). Birchwood's invoices for these properties were deleted. (Pls.' Exs. 348-349).  A credit card in Grubworm's name was charged for purchases related to three of the properties that were never owned by Grubworm. (Pls.' Ex. 347).

81.     In addition to the losses to Grubworm, Birchwood generated losses related to Grubworm's purchase of properties.  Birchwood performed electrical services at some of Grubworm's properties and recorded the services in QuickBooks, but no payment was received by Birchwood and the invoices were deleted.  (Pls.' Exs. 304, 320 and 68).

**D. The Debtor's Scheme to Manipulate the DSCR and Shelter Assets is Uncovered by the Plaintiffs.**

82.     In early May 2021, Kory Bellmont, one the Plaintiffs' personal friends, and Shannon Bertram, met Wade Rodenwald at Shannon Bertram's business.  Wade Rodenwald did not know that Kory Bellmont was friends with the Plaintiffs.  Wade Rodenwald told Kory Bellmont and Shannon Bertram that he helps people and businesses hide and shelter assets to avoid paying debts.  Wade Rodenwald was wearing a shirt with the Birchwood logo and told Kory Bellmont and Shannon Bertram that Birchwood was one of his clients.

18

83.     On May 6, 2021, the Plaintiffs' lawyer, Gordon Hansmeier, sent the Debtor and Birchwood a demand letter. It provided, in pertinent part, as follows:

> I have been contacted by Tony and Rachel Thoennes regarding the sale of Birchwood Electric, Inc. and the failure of receiving payments under the terms of the sale.
>
> As of April 18, 2021 the balance on the purchase price was $1,077,214.26. The balance as of June 18, 2021 will be $1,088,105.18 because I understand the bank suspended payments through June 18th. Interest accrues each month at a rate of $5,445.46 and your payment amount each month is $9,938.66. You have missed 54 payments.
>
> My clients have wanted to work with you but it is becoming apparent there is another agenda they aren't going to tolerate. You have retained Wade Rodenwald as a consultant who was telling local business owners how he is able to shelter money to prevent paying my clients each month. He said he is planning on waiting for the bank loan to be paid off before he tries to offer my clients pennies on the dollar for their loan. He was boasting about how he works with multiple businesses to hide money whether it be because of divorce or business debts or to avoid large tax bills. At the time he saying this he was wearing a Birchwood shirt and was using specific information that only pertains to my clients' agreement with you and Falcon National Bank.
>
> While my clients were giving latitude to the repayment because of a number of issues and excuses, their patience is now gone and they are turning to me to force the payments to a head.
>
> I would like to set up a meeting with you and whoever else you want to bring to discuss your plans going forward to resolve this.

(Stip. Facts ¶ 88; Pls.' Ex. 43).

84.     One week after the Plaintiffs' demand letter was sent, on May 13, 2021, the Debtor caused approximately 57 invoices and estimates to be deleted from Birchwood's QuickBooks accounting software. (Pls.' Ex. 45). These included estimates for work performed for Wade Rodenwald and Nick Burg. (Stip. Facts ¶ 89; Pls.' Ex. 45).

85.     The Debtor and Wade Rodenwald did not utilize Grubworm to purchase any additional pieces of property after their scheme was uncovered. (Summary Ex. 9).

86.     On July 22, 2021, the Plaintiffs sued the Debtor in Minnesota state court for non-payment under the Note. (Stip. Facts ¶ 90). The Plaintiffs alleged, among other things, that the Debtor was "diverting and manipulating income and expenses in violation of the sale agreement between Plaintiffs and Defendants." (Stip. Facts ¶ 90).

87.     Because of the scrutiny caused by the lawsuit, the Debtor was unable to continue to manipulate the DSCR and, on April 6, 2022, Falcon Bank notified the Debtor that Birchwood's DSCR was 3.06x and he could resume making monthly payments to the Plaintiffs under the Note. A representative from Falcon Bank emailed the Debtor as follows: "Hi, Travis. Q1 of 2022, you had some great numbers! Your debt service coverage ratio is 3.06X, exceeding the minimum of 1.25X requiring seller note to be on standby." (Stip. Facts ¶ 91; Pls.' Ex. 49).

88.     The Debtor did not make any payment to the Plaintiffs following receipt of this letter despite his assertions that he wanted to "keep going" with the business. (T. Burg Dep. Trans. at 154:20, 155:20, Mar. 2, 2023).

**E.  The Debtor Siphons Cash from Birchwood and Destroys Records in Preparation for Bankruptcy While Purporting to Negotiate with the Plaintiffs in Good Faith.**

89.     Contrary to the Debtor's professed desire to continue operating Birchwood, as early as the first quarter of 2022, the Debtor instructed his employees to stop buying parts to finish Birchwood's open projects. (T. Burg Dep. Mar. 2, 2023 at 156:2-13). He explained:

> Like when I'd -- when we'd rough-in houses, for example, we would do the rough-in, and then we would order absolutely everything for the final. Even though we're only being -- we were being paid 60 percent for the rough-in, we would purchase everything for the house, so when we could go back, or in the wintertime, if there was a lull, you know, in -- in business, then we could take those things and start finalling (sic) some of these houses.
>
> So, we just didn't buy any of the final stuff for any of the houses we were roughing-in.

(T. Burg Dep. Trans. at 156-157, Mar. 2, 2023).

20

90.     This instruction to employees to reduce part purchases, however, did not overinflate the profitability of Birchwood for purposes of calculating the DSCR for the first quarter of 2022. Birchwood only reduced its cost of parts expenses by $22,000 between the first quarter of 2021 and the first quarter of 2022, but saw a $150,000 increase in invoices billed when comparing the first quarter of the prior year.  (Pls.' Ex. 71).

91.     As early as April 2022, the Debtor began to tell builders he was not sure if he could finish any project because of a lawsuit filed by the Plaintiffs. (T. Burg Dep. Trans. at 161, Mar. 2, 2023).

92.     On April 19, 2022, the Debtor used $4,469 of Birchwood funds to prepay health insurance premiums for himself and his family through August 31, 2022. (Stip. Facts ¶ 92; Pls.' Ex. 50). Historically, the Debtor paid his health insurance premiums on a month-to-month basis. (Pls.' Ex. 50).

93.     On May 5, 2022 and May 11, 2022, the Debtor met with an accounting firm called Wealthcare, Inc. ("Wealthcare") for a "consultation on bankruptcy." (Stip. Facts ¶ 93). Using Birchwood funds, on May 20, 2022, the Debtor paid Wealthcare $14,025 and $1,375 for future tax services. (Stip. Facts ¶ 93; Pls.' Ex. 52). Wealthcare prepared Birchwood, Grubworm, and the Debtor and Nikki Burg's taxes from 2017 to present. (Stip. Facts ¶ 93). Wade Rodenwald attended meetings between the Debtor and Wealthcare. (Stip. Facts ¶ 93).

94.     On May 17, 2022—the day the Plaintiffs' state court lawsuit against the Debtor was scheduled for trial—the Debtor offered to settle the litigation and his obligations under the Note for $900,000. (Stip. Facts ¶ 94). The outstanding balance under the Note at the time was approximately $1.15 million.  The Debtor proposed that he would pay the Plaintiffs $480,000 in cash on or before June 16, 2022, and the remaining balance of $420,000 in installments over a

period not to exceed 10 years. (Stip. Facts ¶ 94). After reaching the settlement, in lieu of having the trial, the parties entered the agreed judgment on the record before the trial court. (Stip. Facts ¶ 94). The Debtor represented to the court that he understood the agreement and wanted to resolve the matter. (Stip. Facts ¶ 94).

95.     However, the Debtor did not consider the $900,000 settlement a "resolution."  One day after recording the settlement agreement, on May 18, 2022, Nikki Burg, at the direction of the Debtor, refunded 38 Birchwood Technology, Inc. customers for their annual security monitoring, for a total of $7,763.39 in refunds. (Stip. Facts ¶ 95; T. Burg Dep. Trans. at 189:11-17, Mar. 2, 2023; Pls.' Ex. 51).

96.     The Debtor explained his reasoning for the refunds as follows:

Q.  So, here's my question for you, Mr. Burg: If you were making representations, and you had a loan to settle with the Thoenneses as of May 31st, why were you refunding customer accounts –

A. Refund –

Q. -- before you made the representation to counsel for the Burgs [sic] and before you entered into the agreement to -- of the 900,000 judgment?

A. Yeah, again, we -- bankruptcy was always an option there, and I kind of figured they're -- they're never going to settle with me after all the options I gave to them, and these are customers that they pay on an annual basis, so it was one of those things that I didn't want to stiff them, so they got a credit for the unused portion of their monitoring.

Q.  And you made that determination prior to our settlement discussions with the Burgs -- with the Thoenneses?

A. I mean, you could see where it was going.

Q.  So, are you saying that you had no intent to perform the judgment that was entered by the Court?

A.  No, I really wanted to make it happen, but they, again, wouldn't negotiate anything.

22

(Stip. Facts ¶ 96; T. Burg Dep. Trans. at 189-191, Mar. 2, 2023).

97.  On May 25, 2022, the Debtor formally closed Birchwood and laid off all of its employees. (Stip. Facts ¶ 97).

98.  On or around May 26, 2022, the Debtor deleted Birchwood's Google Calendar and Google Drive. (Stip. Facts ¶ 98). These were free services the company had maintained and utilized on a daily basis for approximately 18 years. (Stip. Facts ¶ 98). The Google Calendar and Google Drive kept track of Birchwood's jobs, including when and where performed, and details of the tasks to be performed. (Stip. Facts ¶ 98). Nathan Schell was present when the calendar was deleted by the Debtor. (Stip. Facts ¶ 98; N. Schell Dep. Trans. at 60-62, Feb. 27, 2023).

99.  On May 26, 2022, the Debtor requested that Birchwood's email server be deleted. Birchwood's emails were hosted on an email server maintained by Leighton Broadcasting. (Stip. Facts ¶ 99). A representative from Leighton Broadcasting warned the Debtor that if he deleted the email server, all Birchwood emails would be permanently deleted and lost. The Debtor proceeded to delete the records.

100.  On May 27, 2022, the Debtor caused Birchwood to make severance payments to all recently fired employees, including himself and his wife. (Stip. Facts ¶ 100 Pls.' Ex. 54). The Debtor received a $4,430 severance payment, and Nikki Burg received a $4,200 severance payment. (Stip. Facts ¶ 100; Pls.' Ex. 54). The Debtor also paid himself $4,700 and his wife $883 for accrued vacation. (Stip. Facts ¶ 100; Pls.' Ex. 54).

101.  In total, the Debtor caused Birchwood to pay $44,556.40 in severance to himself and Birchwood's employees, and to pay $134,529.09 in wages and vacation payout for May 2022. (Stip. Facts ¶ 101; Pls.' Ex. 54). Birchwood's average wages for each month prior to May 2022 was $36,000. (Stip. Facts ¶ 101; Pls.' Ex. 104).

*ACTIVE 687320735v3*

102.     Birchwood also paid Consulting By Wade $21,600 in "consulting" fees for January 1, 2022 to June 30, 2022, and rent was paid to Consulting By Wade for June and July 2022.  Despite the consulting fees paid to Wade Rodenwald for 2022, the Debtor testified at his deposition that Wade Rodenwald was not involved in Birchwood in 2022:

Q. Was Mr. Rodenwald involved in the business at this point?

A.  I don't think so.  I don't recall.

Q.  You don't -- you're not aware of anything he was doing in 2022?

A.  No, I'm not aware.

(T. Burg Dep. Trans. at 158:8-13, Mar. 2, 2023).

103.     On May 31, 2022, the trial court entered the stipulated judgment (the "<u>Stipulated Judgment</u>") that the Debtor and the Plaintiffs agreed to on the record on May 17, 2022.  (Stip. Facts ¶102; Pls.' Ex. 55).

104.     On the same day, the Debtor filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code.  (Stip. Facts ¶ 103; Pls.' Ex. 56).

105.     Neither the Debtor nor Birchwood were in default or behind on payments to any creditor besides the Plaintiffs at the time the Debtor filed for chapter 7 relief.

106.     On the Debtor's bankruptcy petition, he indicates that no unpaid amounts are due to him for unpaid loans and he had no claims against third parties for a right to payment.  (Stip. Facts ¶ 104).

107.     The Debtor scheduled the Plaintiffs' debt as $900,000, disputed and unliquidated. (Stip. Facts ¶ 105).

108.     On November 1, 2022, the Plaintiffs filed a proof of claim in the amount of $1,172,509.81 related to the unpaid balance of the Note and accrued interest.

*ACTIVE 687320735v3*

**F. The Debtor Destroys and Falsifies Business and Financial Records, and Lies at the 341 Meetings.**

109.    Immediately before or after closing Birchwood, the Debtor concealed, mutilated, or destroyed physical business and financial records located at Birchwood's office, or caused another person to do so.

110.    Work orders were created for every job that a Birchwood employee was sent to and would include the name, address, phone number, and a description of the work to be performed. (N. Schell Dep. Trans. at 12, 28-29, Feb. 27, 2023).  This same information was entered into QuickBooks in a customer profile, with the work order representing the "hard copy" to be taken into the field by the electricians.  (N. Schell Dep. Trans. at 28-29, Feb. 27, 2023).  The work orders were kept for seven years from date of final work performed. (N. Schell Dep. Trans. at 16, Feb. 27, 2023). The Debtor and Nathan Schell were responsible for removing work orders that were more than seven years old. (N. Schell Dep. Trans. at 17, Feb. 27, 2023).

111.    No work orders for Wade Rodenwald's rental properties, Grubworm properties, or Bold Image properties were located in Birchwood's filing cabinets.  One work order was recovered for work performed at Wade Rodenwald's home in 2016 and one work order was recovered for work performed at Nick Burg's house.  Birchwood did not receive payment for the work performed by Birchwood's employees that was annotated on the recovered work orders for Nick Burg and Wade Rodenwald.

112.    Work orders for all jobs in-progress were also removed or destroyed from Birchwood's office.

113.    On July 7, 2022, the Debtor's initial Section 341 meeting was held.  During the initial 341 meeting, the Debtor testified that he had not destroyed or deleted any of Birchwood's

business records and agreed he would not delete any information or change any information in QuickBooks. (341 Trans. at 28:8–24, July 7, 2022).

114.    Less than one week after the initial 341 meeting, between July 13 and July 15, 2022, the Debtor altered Birchwood's QuickBooks system relating to various checks recorded in Birchwood's QuickBooks system.  For example:

a.      On or around December 11, 2019, Birchwood wrote a $7,000 check to the Debtor. In the corresponding and contemporaneous entry in Birchwood's QuickBooks software, the check did not have a description.  **On July 13, 2022, at 4:27 pm**, the Debtor modified the QuickBooks entry to describe the check as being for "Medical bills."

b.      On September 8, 2021, Birchwood wrote a $15,000 check to the Debtor.  In the corresponding and contemporaneous entry in Birchwood's QuickBooks software, the check did not have a description.  **On July 13, 2022, at 4:34 pm**, the Debtor modified the QuickBooks entry to describe the check as being for "Clear out Vacation pay."

c.      In August 2020, Birchwood wrote a $10,000 check to the Debtor.  In the corresponding and contemporaneous entry in Birchwood's QuickBooks software, the payment was described as "SLUSH UPDATES."  **On July 14, 2022, at 4:27 am**, the Debtor modified the QuickBooks entry to describe the check as being a "vaca payout."

d.      On November 19, 2020, Birchwood wrote a $20,000 check to Wade Rodenwald. **On July 15, 2022, at 6:45 am**, the Debtor modified the corresponding entry in

26

Birchwood's QuickBooks software to make the Debtor—rather than Wade Rodenwald—the payee of the check with a handwritten memo of "down payment.".

e.　In February 2020, Birchwood wrote a $23,000 check to Nikki Burg. In the corresponding and contemporaneous entry in Birchwood's QuickBooks software, the payment was described as "SLUSH PULLED 2/5." **On July 15, 2022, at 7:16 am**, the Debtor modified the QuickBooks entry to (i) make the Debtor—rather than Nikki Burg—the payee of the check and (ii) describe the check as being for "reimbursement for wages paid from savings" This check was deposited into Nikki's bank account and utilized as a down payment for the Melrose property purchased on February 14, 2020. No payments to Birchwood from Nikki or the Debtor's bank accounts are reflected to account for this "reimbursement for wages paid from savings."

f.　On February 12, 2021, Birchwood wrote a $15,000 check to the Debtor. In the corresponding and contemporaneous entry in Birchwood's QuickBooks software, the check did not have a description. **On July 15, 2022, at 7:19 am**, the Debtor modified the QuickBooks entry to describe the check as being for "shop roof, insulate."

(Pls.' Ex. 61).

115.　Prior to the continued 341 meeting, the chapter 7 trustee asked the Debtor for his Venmo statements on August 4 and August 16, 2022. When questioned about the Venmo statements at the continued 341 meeting, the Debtor stated "I can look back and see what they allow me to get in the account, you know, email (inaudible). I could guess it, but I could figure it out." (341 Trans. at 2:10-14, Aug. 27, 2022).

*ACTIVE 687320735v3*

116.    The Debtor did not provide the chapter 7 trustee with Venmo statements.  Instead, one day after the 341 meeting, the Debtor deposited $2,570.10 from his Venmo account into his personal bank account and cancelled his personal Venmo account without providing any statements to the chapter 7 trustee or in response to discovery requests. (Pls.' Ex. 70).

117.    On August 17, 2022, a continued Section 341 meeting was held. The Debtor falsely testified that he had not destroyed or deleted any of Birchwood's business records.

> Q:  So it is your testimony here today that you did not delete or modify any transactions to draws that you took or other transactions relating to you or Mr. Rodenwald?
>
> A:  No.

(341 Trans. at 41, Aug. 17, 2022).

118.    During the continued 341 meeting, the Debtor lied when he stated that he only performed services for Rodenwald and his friends and family personally or through Grubworm and did not utilize Birchwood:

> Q. You testified on July 7 as well that the only company Birchwood Electric traded services with was Laten Advertising, do you recall that testimony?
>
> A. Yep.
>
> Q. You further testified that you do not recall any other individual or entity that Birchwood Electric traded services for while you owned or controlled the company; do you recall that testimony?
>
> A. Yes.
>
> Q. Did Birchwood Electric trade services or provide services to any properties owned or controlled by Mr. Rodenwald?
>
> A. Maybe a few here or there, but I tried to do all the work myself.
>
> Q. What does that mean?
>
> A. Like nights and weekends I'd go and work on some of the property for him.

ACTIVE 687320735v3

Q. So are you saying you'd independently work for Mr. Rodenwald independent of Birchwood Electric and Grubworm?

A. Yeah, I guess it would be independently with Grubworm, because I owned Grubworm.

Q. And how many services did you provide to Mr. Rodenwald and other entities owned or controlled by Mr. Rodenwald?

A. If it was ever just a sale on a Grubworm house is usually what it was, you know. If they needed some paint or it needed a [GFI] in the kitchen or replace a door here or there, you know. That kind of stuff. But it seemed to always be after the home inspected [sic] after they sold the house.

(341 Trans. at 33-35, Aug. 17, 2022).

119.    A few weeks later, in response to an inquiry by the Office of the United States Trustee regarding the 47 deleted invoices and estimates provided to Rodenwald, the Debtor finally explained his trades with Rodenwald and his routine deletions from Birchwood's QuickBooks accounting system:

> [A.] Wade has been an independent contractor who helped me grow the grubworm business throughout the past couple years, which was going to be another means of "payment" to help with the acquisition of birchwood electric. I traded my services and labor on the sale homes for a discounted commission for grubworm and labor on grubworm properties and his expertise in helping to grow grubworm. This LLC was meant to add another income avenue for Nikki and I. As properties were finished jobs were deleted.

(Pls.' Ex. 68).

120.    The Debtor admitted to the Office of the United States Trustee the pattern he utilized from 2017 to 2022 with respect to deleting Rodenwald and Grubworm invoices, but the Debtor's pattern also applied to work Birchwood provided to the Debtor's friends, family members, and Rodenwald affiliated entities.

121.    The Debtor lied at his continued 341 meeting when he denied trading services or performing free work through Birchwood and denied deleting or altering any records. (*See* 341 Trans. at 35-38, Aug. 17, 2022). Both Nathan Schell and Peter Allen performed electrical services

29

on invoices that were later deleted by the Debtor and for which no payment was received by Birchwood, including for Nick Burg and Wade Rodenwald.

122.    Birchwood provided at least $180,000 in services to Wade Rodenwald and his affiliates without payment or value in trade. Birchwood provided at least $120,000 in services to the Debtor's friends and families without payment or value in trade. (Summary Exs. 1, 5).

**G.    The Debtor Completes His Scheme to "Get Rid" of the Obligation to the Plaintiffs by Starting a New Electrical Company Without The Note or the Plaintiffs' Security Interest.**

123.    One week after the Debtor's initial 341 meeting, the Debtor continued his plan created prior to the bankruptcy petition to "get rid of" the Plaintiffs and continue operating an electrical company.

124.    On June 14, 2022, the Debtor filed articles of organization with the Minnesota Secretary of State to form Edge Electric LLC ("Edge Electric"). (Stip. Facts ¶ 106; Pls.' Ex. 57). On July 14, 2022, the Minnesota Department of Labor and Industry issued a new electrical contractor license to Edge Electric and the Debtor. (Stip. Facts ¶ 106; Pls.' Ex. 57).

125.    The Debtor has operated Edge Electric from and after its formation and has obtained at least 15 electrical permits from the Minnesota Department of Labor and Industry for electrical work.

126.    The Debtor, through Edge Electric, has continued to perform services for customers of Birchwood, including Wade Rodenwald, TLC Enterprises, LLC, Zachary Raker, Doug Kloss and Wealthcare.

127.    In a series of text messages sent to the Debtor from February 27 to March 3, 2023, the Debtor communicated to Wade Rodenwald that the Debtor was "Just doing some billing St. Cloud townhome finish = $767.95 St. Cloud townhome correction that gave to Zack already his

30

request = $211.75" and "Doug said to send the patio home invoice to you. $187.50." (Pls.' Ex. 69).

128.    Edge Electric and the Debtor have received over $100,000 in deposits and at least $31,739.38 in payments from Birchwood's former customers, including some customers who were named in deleted invoices while the Debtor owned Birchwood, such as Rodenwald and Wealthcare. (Pls.' Ex. 105).

129.    Rodenwald, despite rarely making any payments to Birchwood between 2017 and the petition date, has made regular payments to Edge Electric or the Debtor since the Debtor filed for bankruptcy. (Pls. Ex. 105).

## CONCLUSIONS OF LAW

130.    The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a), and 11 U.S.C. §§ 526 and 727(c).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (I) and (J).

131.    The Plaintiffs have the burden to prove by a preponderance of the evidence that a discharge to the Debtor should be denied under Section 727(a) or the Debtor's debt to the Plaintiffs should be excepted from discharge under Section 523(a). *See Allred v. Vilhauer (In re Vilhauer)*, 458 B.R. 511, 514 (B.A.P. 8th Cir. 2011); *In re Olson*, 333 B.R. 835, 837–38 (Bankr. D. Minn. 2005).

### COUNT I
### Objection to Discharge Under Section 727(a)(2)

132.    Pursuant to Section 727(a)(2) of the Bankruptcy Code, a bankruptcy court shall not grant the debtor a discharge if "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed,

31

mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition; or . . . property of the estate, after the date of the filing of the petition."

133.    Within one year before the Petition Date, with intent to hinder, delay, or defraud the Plaintiffs, the Debtor transferred, removed, destroyed, mutilated, or concealed Birchwood's assets and business/financial records, or permitted others to do so on his behalf, in the following manner:

a.    The Debtor, or someone acting on his behalf, removed physical records and customer files at Birchwood's office.

b.    The Debtor deleted and modified QuickBooks references related to trades or free services with Wade Rodenwald and other friends and family.

c.    The Debtor deleted the books and records maintained on Google Drive and Google Calendar.

d.    The Debtor, or his spouse acting as directed by the Debtor, voluntarily drained Birchwood of cash in the lead up to filing for bankruptcy by paying for personal expenses through Birchwood, or issuing severance payments and refunding customers in preparation for bankruptcy.

134.    The Debtor transferred, removed, destroyed, mutilated or concealed Birchwood's assets and business/financial records in order to (a) manipulate the DSCR; (b) deplete Birchwood's assets; (c) divert Birchwood's assets to himself, Rodenwald, Rodenwald's affiliates, and/or Grubworm; (d) avoid paying the Plaintiffs amounts due and owing under the Note; and (e) conceal the evidence of his fraudulent scheme.

135.    After the Petition Date, with intent to hinder, delay, or defraud the Plaintiffs, the Debtor transferred, removed, destroyed, mutilated, or concealed assets and business and financial

32

records of Birchwood, including modifying QuickBooks records to remove references to transfers made to himself, his spouse, and Rodenwald, to conceal his fraudulent scheme to avoid paying the Plaintiffs amounts due and owing under the Note.

136.     As a result of the foregoing, the Debtor is not entitled to a discharge of his debts to the Plaintiffs pursuant to Section 727(a)(2) of the Bankruptcy Code.

**COUNT II**
**Objection to Discharge Under Section 727(a)(3)**

137.     Pursuant to Section 727(a)(3) of the Bankruptcy Code, a bankruptcy court shall not grant the debtor a discharge if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."

138.     Both before and after the Petition Date, the Debtor concealed, destroyed, mutilated, falsified, or failed to keep or preserve the business and financial records of Birchwood from which the Debtor's financial condition or business transactions might have been ascertained.

139.     The Debtor intentionally destroyed or failed to keep or preserve records contained in Birchwood's Google Drive, Google Calendar, and emails.  Google Drive and Google Calendar were free services utilized by the Debtor and would have included sufficient information for the trustee and creditors to ascertain the financial condition of the Debtor and business transactions of Birchwood.

140.     The Debtor also intentionally destroyed or failed to keep or preserve paper records of Birchwood and completed and in-progress work orders.  The paper records would have provided the financial condition and business transactions of the Debtor and were stored in an office space Birchwood paid to maintain for two months following the Debtor's bankruptcy petition.  The paper

33

records were wrongfully removed or destroyed by the Debtor or were not adequately preserved by the Debtor.

141. The Debtor intentionally deleted QuickBooks customer account information and records of payment, including Venmo statements requested by the chapter 7 trustee, which would have permitted the chapter 7 trustee or the Debtor's creditors to ascertain the Debtor's financial condition or business transactions.

142. The Debtor's acts or failures to act were not justified under the circumstances of the case and occurred while a lawsuit was ongoing and the Debtor was represented by counsel.

143. Instead, the Debtor acted with intent to conceal the evidence of his fraudulent scheme to (a) manipulate the DSCR; (b) deplete Birchwood's assets; (c) divert Birchwood's assets to himself, Rodenwald, Rodenwald's affiliated entities, and/or Grubworm; and (d) avoid paying the Plaintiffs amounts due and owing under the Note.

144. As a result of the foregoing, the Debtor is not entitled to a discharge of his debts to the Plaintiffs pursuant to Section 727(a)(3) of the Bankruptcy Code.

## COUNT III
### Objection to Discharge Under Section 727(a)(4)

145. Pursuant to Section 727(a)(4) of the Bankruptcy Code, a bankruptcy court shall not grant the debtor a discharge if "the debtor knowingly and fraudulently, in or in connection with the case (A) made a false oath or account; (B) presented or used a false claim; (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs."

34

146.    The Debtor knowingly and fraudulently made false statements during the initial 341 Meeting and the continued 341 Meeting regarding free services or trades to Rodenwald and the contractors who performed work on his homestead, including Nick Burg, H & S, Opatz Metals, Bold Image, and Colorful Concepts.

147.    The Debtor knowingly and fraudulently made false statements during the initial 341 Meeting and the continued 341 Meeting regarding his deletion of Birchwood's QuickBooks records when Birchwood performed services for his friends, family, or contractors with whom he traded or performed free services.

148.    The Debtor knowingly and fraudulently made false statements regarding the purpose of Grubworm and his and Birchwood's involvement with the houses purchased by Grubworm.

149.    The Debtor knowingly and fraudulently induced the Plaintiffs under false pretenses to agree to the stipulated judgment which impaired their Note claim by hundreds of thousands of dollars by not disclosing that he intended to file for bankruptcy if they settled for the agreed-to sum of $900,000.

150.    The Debtor knowingly and fraudulently withheld Birchwood's true and correct business and financial records from the Plaintiffs and the chapter 7 trustee, including work orders for Rodenwald-related properties and in-progress projects and paper records stored at Birchwood's place of operations.

151.    As a result of the foregoing, the Debtor is not entitled to a discharge of his debts to the Plaintiffs pursuant to Section 727(a)(4) of the Bankruptcy Code.

**COUNT IV**
**Objection to Discharge Under Section 727(a)(5)**

35

152.	Pursuant to Section 727(a)(5) of the Bankruptcy Code, a bankruptcy court shall not grant the debtor a discharge if "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."

153.	The Debtor failed to explain satisfactorily the loss of assets and/or deficiency of assets to meet the Debtor's liabilities to the Plaintiffs in the following ways:

a.	The Debtor failed to satisfactorily explain the value provided to Birchwood in exchange for the $399,000 cash payments made to Wade Rodenwald and Consulting By Wade.

b.	The Debtor failed to satisfactorily explain the losses to Grubworm in favor of Wade Rodenwald and his affiliates when Grubworm was created as an asset company to generate revenue to meet the Debtor's liabilities to the Plaintiffs.

c.	The Debtor has failed to explain the payments to Grubworm for real property rent when Birchwood did not have a lease with Grubworm.

d.	The Debtor has failed to adequately explain why funds were not deposited into Grubworm's account from Birchwood or Sunset Lighthouse and where the funds are held.

e.	The Debtor failed to adequately explain the $300,000 in trades and gifts of services provided by Birchwood to his friends, relatives, and Wade Rodenwald and Rodenwald's affiliates and any value received by the Debtor in exchange for the services performed by Birchwood.

f.	The Debtor failed to satisfactorily explain his more than $1,000,000 in equity draws from Birchwood to himself, Wade Rodenwald, Nikki Burg, and Grubworm LLC.

36

154.     As a result of the foregoing, the Debtor is not entitled to a discharge of his debts to the Plaintiffs pursuant to Section 727(a)(5) of the Bankruptcy Code.

## COUNT V
### Exception to Discharge Under Section 523(a)(6)

155.     Pursuant to Section 523(a)(6) of the Bankruptcy Code, "a discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity."

156.     The Debtor willfully and maliciously injured the Plaintiffs and Plaintiffs' property by concealing and altering (a) Birchwood's business/financial records; (b) manipulating the DSCR; (c) depleting Birchwood's assets; (d) diverting Birchwood's assets to himself, Rodenwald, Rodenwald's affiliates, and/or Grubworm; (e) inducing the Plaintiffs to agree to the stipulated judgment under false pretenses; and (f) making false statements during the initial 341 meeting and the continued 341 meeting to hide the transferred assets from the Plaintiffs.

157.     The Debtor intentionally and knowingly took these actions to avoid paying the Plaintiffs the amounts due and owing under the Note from 2017 through the Stipulated Judgment.

158.     But for the Debtor's willful and malicious conduct, Birchwood would have satisfied the DSCR requirements under the Subordination Agreement for payment to the Plaintiffs from and after January 2017.

159.     When the Debtor was informed by Falcon Bank that he was permitted to make a payment to the Plaintiffs under the Subordination Agreement, the Debtor knowingly and willfully refused to do so and closed the business, informing employees two weeks before he did so that he intended to close the business rather than pay the stipulated sum of $900,000.

37

160.    The Debtor's conduct was targeted at the Plaintiffs with the intent to cause them harm by avoiding payment under the Note and destroying the value of their security interest in Birchwood by liquidating the company.

161.    The Debtor's conduct was malicious, as he paid all other creditors and made disbursements to his family and staff immediately preceding his bankruptcy filing, knowing that he stripped Birchwood of cash assets that could otherwise be recoverable by the Plaintiffs or would devalue the Plaintiffs' security interest in the stock of Birchwood.

162.    The Plaintiffs were harmed by the actions the Debtor took to avoid paying the Plaintiffs from and after 2017 and culminating in the devaluation of their security interest in Birchwood and the liquidation of the company.

163.    As a result of the foregoing, the Debtor's debts to the Plaintiffs should be excepted from discharge pursuant to Section 523(a)(6) of the Bankruptcy Code.

### COUNT VI
### Attorney Fees and Costs

164.    The Debtor defaulted in paying amounts due and owing under the Note in January 2017 and has remained in default to present.

165.    The Note requires the Debtor to pay the Plaintiffs' reasonable attorneys' fees and costs related to enforcement and collection of the Note after the Debtor's default in his payment obligations.

166.    The Plaintiffs retained counsel to enforce the Note and the Stipulated Judgment and collect amounts due and owing thereunder.

167.    This action is part of and related to the Plaintiffs' efforts to enforce the Note and collect amounts due and owing thereunder.

38

168.    The Plaintiffs are entitled to recover their reasonable attorneys' fees and court costs in connection with this action.

## PROPOSED JUDGMENT

169.    The Debtor is not entitled to a discharge under Section 727(a)(2), (3), (4), (5) and (6) of title 11 of the United States Code .

170.    Alternatively, if the Debtor was entitled to a discharge under Section 727, his debts to the Plaintiffs are excepted from a discharge under Section 523(a)(6).

171.    The Plaintiffs are entitled to reasonable attorneys' fees and costs in an amount to be determined upon motion filed with the Court under Fed. R. Bankr. P. 7054.

**GREENBERG TRAURIG, LLP**

Dated: May 16, 2023

*/e/ Michael B. Fisco*
Michael B. Fisco (#0175341)
Whitney A. Mark (#0398243)
Mary A. Scott (#0398534)
90 South Seventh St., Suite 3500
Minneapolis, MN 55402
Phone: (612) 259-9700
Email: fiscom@gtlaw.com
        Whitney.mark@gtlaw.com
        mary.scott@gtlaw.com

*Attorneys for Plaintiffs, Tony and Rachel Thoennes*

39