## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                                          Case No. 22-60172

Travis L. Burg,

        Debtor.                                            Chapter 7

---

Tony and Rachel Thoennes,                                       Adv. No. 22-06011

               Plaintiffs,

v.

Travis L. Burg,

            Defendant.

---

## MEMORANDUM DECISION AND ORDER FOR JUDGMENT

At Fergus Falls, Minnesota, December 29, 2023.

This chapter 7 case came before the Court on Creditor-Plaintiffs Tony and Rachel Thoennes' Motion to deny Defendant-Debtor Travis L. Burg's discharge under 11 U.S.C. § 727(a)(3)-(5) or, in the alternative, to find their debt non-dischargeable under 11 U.S.C. § 523(a)(6).[1] (ECF No. 1). The parties submitted pre-trial briefs and stipulated facts—which contained 106 paragraphs of undisputed facts. (ECF Nos. 22, 26-29). The six-day trial began on May 24, 2023, in Fergus Falls, Minnesota and concluded on June 20, 2023, in Minneapolis, Minnesota.[2] Michael B. Fisco, Michael M. Krauss, and Mary A. Scott appeared on behalf of the

---

[1]    All statutory references to the Bankruptcy Code are to the specified provisions within 11 U.S.C. §§ 101-1532.

[2]    For the convenience of the Court, counsel, parties, and witnesses, after May 24, 2023, the trial was held at the Diana E. Murphy United States Courthouse, Minneapolis, Minnesota.

Plaintiffs. Sam V. Calvert appeared on behalf of the Debtor. The Plaintiffs submitted over 460

exhibits and the Defendant submitted 53. At the conclusion of the trial, the Court invited the parties

to file contemporaneous supplemental memoranda. The parties timely complied. (ECF Nos. 55-

58). Thereafter, the Court took the matter under advisement, and it is now ready for resolution.

This memorandum decision constitutes the Court's findings of fact and conclusions of law

under Fed. R. Bankr. P. 7052. The Court has jurisdiction over this adversary proceeding pursuant

to 28 U.S.C. §§ 157 and 1334. This is a core proceeding per 28 U.S.C. § 157(b)(2)(A), (I), and (J).

For the reasons stated herein, Travis L. Burg's discharge is **DENIED**.

## BACKGROUND

Plaintiffs Tony and Rachel Thoennes are husband and wife and are the founders and former

operators of two electrical companies: Birchwood Electric and Birchwood Technology.[3] (Stip.

Facts ¶ 2). Birchwood provided electrical contractor services for new and existing residential

homes. (Stip. Facts ¶ 3). Birchwood hired the Defendant Travis Burg in 2011. (Stip. Facts ¶ 5).

When he joined Birchwood, Debtor had a license to perform low-voltage electrical work and

worked primarily installing lights and security monitoring systems as well as doing office work.

(Stip. Facts ¶ 5-7).

In 2013, the parties began discussing the Thoenneses selling Birchwood to Burg. (Stip.

Facts ¶ 8). To finance the purchase of Birchwood, Burg took out a loan from Falcon National Bank

(Falcon Bank). (Stip. Facts ¶ 15; Ex. 5 & 8). Before financing the Debtor's purchase of Birchwood,

Falcon Bank engaged an accounting firm to perform an independent valuation appraisal of the

businesses. (Stip. Facts ¶ 8). The accounting firm concluded that the Plaintiffs' stock in Birchwood

---

[3]     For clarity, Birchwood Electric and Birchwood Technology will be referred to collectively
as "Birchwood".  If it is necessary to differentiate between the companies, the specific name will
be used.

was worth $1,802,264. (Stip. Facts ¶ 8; Ex. 8). Copies of the spreadsheets used to evidence the working capital loan were provided to the parties and agreed to at closing. (Tr. 5/24/2023 p. 58 lines 6-25). The terms of the loan included a subordination agreement. This required Debtor to maintain a Debt Service Coverage Ratio[4] (DSCR) of 1.25X each quarter to be able to continue making his $9,938.66 monthly payments to the Thoennesses. (Ex. 5-6). If the quarterly DSCR fell below 1.25X, the bank would notify Burg, and he could not make any monthly payments to the Thoennesses until he got the DSCR back above the threshold. Pursuant to a Stock Purchase Agreement, Burg purchased all of Birchwood's stock from the Thoennesses for $1,800,000.00. (Stip. Facts ¶ 10; Ex. 2). Burg paid the Thoennesses $878,500.00 at closing with the remaining balance of $921,500.00 to be paid in monthly instalments of $9,938.66 over the next ten years. (Stip. Facts. ¶ 10; Ex 3).

To aid in a smooth transition for the company, Ms. Thoennes stayed on as Birchwood's office manager for a few months after the transfer of ownership.  During this time, she did miscellaneous tasks to assist Burg with the operation.  (Tr. 5/24/23 p. 51 lines 7-22).

Debtor made all payments to the Thoennesses from March 2014 through December 2016. (Stip. Facts ¶ 21). However, at the end of December 2016, Falcon Bank notified Debtor that he had failed to meet the DSCR for two quarters, meaning that he had to suspend payment to the Thoennesses until it returned to the minimum threshold requirement of 1.25. (Stip. Facts ¶ 23; Ex.

---

[4]      Neither the underlying paperwork, nor any of the parties defined DSCR. Therefore, the Court is taking Judicial Notice pursuant to Fed. R. Evid. 201(b)(2) of the following definition: "Debt service coverage ratio. This ratio measures how easily a borrower can pay interest and scheduled amortization payments on its outstanding debt. It is determined by dividing the borrower's EBITDA (Earnings before interest, taxes, depreciation, and amortization) by its scheduled debt payments. This covenant also sets a floor for the borrower below which the ratio may not fall without creating a default." Loan Agreement: Financial Covenants, Practical Law Practice Note 3-384-0955

34). December 2016 was the last time that Debtor made any payment to the Thoenneses. (Stip. Facts ¶ 24).

In late 2016, Debtor began consultations with Wade Rodenwald, a friend from high school, who was known in the area for sheltering assets from the reach of creditors, ex-spouses, and the IRS. (Stip. Facts ¶ 26-27, 88; Ex. 43; Tr. 5/31/2023 pp. 668-669). In late 2016 or early 2017, Debtor met with Rodenwald who told him that he paid too much for the company. (Stip. Facts ¶ 27 Ex. 103, Burg Dep. Trans., pp. 80-82, Mar. 2, 2023). "Wade didn't feel like Travis had got a good deal." (Tr. 5/31/2023 p. 678 lines 23-24). Mr. Rodenwald did not have any experience in the electrical business field. (Tr. 5/25/2023 pp. 405-06). But he told other business owners in the area that he was helping Burg "by consulting him and essentially taking money and sheltering it from Birchwood." (Tr. 5/31/2023 p. 678 lines 24-25–p. 679 line 1). Testimony at trial indicated that Rodenwald was helping Burg avoid paying the money he owed the Thoenneses from purchasing Birchwood. (Tr. 5/31/2023 p. 679 lines 2-5). Burg would take money out of Birchwood to pay it to Rodenwald as a "consulting fee" through Consulting by Wade. (Tr. 5/31/2023 p. 679 lines 17-20). Wade could then invest it in real estate. (Id.) Debtor caused Birchwood to hire Wade Rodenwald through his company Consulting by Wade. Birchwood, at the direction of Burg, ended up paying Rodenwald $2,25,37.00 in consulting fees and $105,000.00 in rent to Consulting by Wade. (Ex 28; Stip. Facts ¶ 39).

Throughout Burg's ownership of Birchwood, even though the DSCR fell below the 1.25X mark, Birchwood remained a profitable business.  (Tr. 5/25/23 p. 347 lines 17-21). Additionally, throughout his ownership, Burg personally had complete control over the accounting software QuickBooks.  (Tr. 5/25/23 p.355 lines 11-19; pp. 357-58). Through forensic tools in QuickBooks as well as testimony from Burg himself and other witnesses, it was disclosed that Burg repeatedly

provided free services to friends and family through Birchwood and then he would delete the QuickBooks records of the jobs. Some deleted items included work done on Burg's cousin, Nick Burg's house, and those related to businesses owned by Nick. (Stip. Facts 44-48). Birchwood provided work for other companies as "trade" and through owner's capital draws. (Stip. Facts 49-52).

Besides paying Consulting by Wade, and deleting documents for work done, Burg caused Birchwood to make payments to Grubworm, LLC, a company he formed in 2018. (Stip. Facts 53). Debtor's testimony throughout his bankruptcy process was inconsistent about the business purpose of Grubworm. He testified at his 341 Meeting that it was "just a trenching company." (Stip. Facts 54). He then testified in a deposition that he started the company in order to invest in and flip homes as another source of income. (Stip. Facts 55). At trial, Burg testified that Grubworm was primarily a trenching company. However, Debtor, Mrs. Burg, and Grubworm invested in at least eight houses between 2018 and 2020. Seven were purchased by Grubworm, and the eighth, in Melrose, Minnesota, was purchased by the Debtor and Mrs. Burg individually. (Stip. Facts. 74). Debtor and Wade Rodenwald's actions in creating Grubworm, selling homes, and having work done that was not paid for and was later deleted from QuickBooks were part of a plan to avoid paying the plaintiffs. There was no testimony given by Rodenwald or Burg to contradict that this was their plan. Therefore, the more credible testimony shows that Grubworm was used not as a trenching company, but as an entity to transfer properties.

Burg caused Birchwood to do electrical work for Rodenwald, his properties, and homes owned by Grubworm. (Stip. Facts. 67-69). Birchwood paid expenses for parts and permits related to these properties. (Stip. Facts 71). However, Birchwood was not compensated for most of these expenses, or for the work Birchwood performed. (Stip. Facts 75; Ex. 304, 320, 68).

In early 2017, Debtor and Rodenwald met with an attorney to get help "removing" Birchwood's obligations to the Thoenneses. (Stip. Facts ¶ 28). At this meeting, Debtor told the attorney "We're trying to come up with a solution to get rid of the old owners." (Id.; Travis Burg Dep. Mar. 2, 2023, at 41-42). This attorney was not retained. However, on January 10, 2017, Debtor, on behalf of Birchwood, retained another law firm. (Stip. Facts ¶ 29). This began the long history of Debtor's attempts to settle the debt with the Thoenneses, in which he repeatedly informed them that if they did not settle, he would file bankruptcy.

On February 7, 2017, the Plaintiffs, Debtor, and Rodenwald met in person at the law firm's office to discuss the monthly payment default. Mrs. Thoennes computed the outstanding balance due as $804,941.26. At the meeting the Debtor once again expressed his belief that he overpaid for Birchwood Electric. The Debtor offered to pay $100,000 in full and final satisfaction of the note or $50,000 with a 10% profit sharing for 2017-2019. (Stip. Facts ¶ 30). If neither alternative was acceptable, Burg said he would declare bankruptcy. (Stip. Facts ¶ 30). Debtor, through his attorney, and the Thoenneses went back and forth with settlement offers for the outstanding balance of $804,941.26. (Stip. Facts ¶ 30-35). This ended with the parties negotiating a payment plan over email. (Stip. Facts 35). The plan provided a $350,000 lump sum payment and a $100,000 loan at 0% interest for two years. (Stip. Facts ¶ 35). On May 2, Burg emailed Ms. Thoennes that the plan had been accepted. (Stip. Facts ¶ 35, Ex. 19). But this settlement was never consummated because on June 9, 2017, Burg backed out of the deal "on advice of counsel". (Tr. 5/31/2023; p. 522 lines 3-22).

Eventually, due to nonpayment of the debt, the parties ended up in state court. On May 17, 2022, the parties were scheduled for trial. Literally, on the courthouse steps, Debtor offered to settle the litigation by the payment to Plaintiffs of $900,000, payable in cash–$480,000 by June

16, 2023, and the $420,000 balance in installments payable over 10 years. The parties recited the terms of this settlement on the record before the state court.

In point of fact, Burg never intended to follow through on the settlement. On May 19, 2022, one day after entering the settlement agreement on the record in state court, Mrs. Burg, at the direction of the Debtor, refunded $7,763.39 to 38 Birchwood Technology customers for their annual security monitoring systems. (Stip. Facts ¶ 95; Ex. 103, Burg Dep. Trans., p. 189 lines 11-17, Mar. 2, 2023; Ex. 51). On May 25, 2022, the Debtor formally closed Birchwood and terminated all its employees. (Stip. Facts ¶ 97). On or around May 26, 2022, the Debtor deleted Birchwood's Google Calendar and Google Drive. (Stip. Facts ¶ 98). These were free services the company had maintained and utilized on a daily basis for about 18 years. (Stip. Facts ¶ 98). The Google Calendar and Google Drive kept track of Birchwood's jobs, including when and where performed, and details of the tasks to be performed. (Stip. Facts ¶ 98). At trial, the Debtor testified that he deleted the information because "[t]here was just a lot of information that all the other employees had access to that I just didn't want floating around." (May 31, Trans., pp. 439, lines 20-22). On cross examination, the Debtor admitted at trial that he did not need to delete the information. Rather, he could have simply removed access of former employees to the information. (June 2, Trans. pp. 863–64). On May 26, 2022, the Debtor requested that Birchwood's email server be deleted. Birchwood's emails were hosted on an email server maintained by Leighton Broadcasting. (Stip. Facts ¶ 99). A representative from Leighton Broadcasting warned the Debtor that if he deleted the email server, all Birchwood emails would be permanently deleted and lost. Despite this admonition, debtor deleted the records. (Ex. 67, Section 341 Meeting Trans., pp. 52 lines 3-25–pp.53 lines 1-3). On May 27, 2022, the Debtor caused Birchwood to make severance payments to all recently fired employees, including himself and his wife. (Stip. Facts ¶ 100; Ex. 54). The Debtor

received a $4,430 severance payment, and Mrs. Burg received a $4,200 severance payment. (Stip. Facts ¶ 100; Ex. 54). The Debtor also paid himself $4,700 and his wife $883 for accrued vacation leave. (Stip. Facts ¶ 100; Ex. 54). In total, the Debtor caused Birchwood to pay $44,556.40 in severance to Birchwood's employees, and to pay $134,529.09 in wages and vacation pay in the month before closing the business. (Stip. Facts ¶ 101; Ex. 54). In stark contrast, Birchwood's average wages for each month prior to May 2022 was $36,000. (Stip. Facts ¶ 101; Ex. 104).

The state trial court entered the stipulated judgment on the record on May 31, 2022–the same day Burg filed his chapter 7 bankruptcy case. (Stip. Facts ¶ 102, ¶ 103; Ex. 55; Ex. 6).

Neither the Debtor nor Birchwood was in default or was behind on payments to any creditor besides the Plaintiffs when the Debtor filed for chapter 7 relief. The Debtor scheduled the Plaintiffs' debt at $900,000 and listed the debt as disputed and unliquidated. (Stip. Facts ¶ 105). The record shows that Burg acquired Birchwood in March 2014 and operated it through May 2022. During that time frame, Birchwood generated $2,840,481.00 in profit, or $28,984.50 each month. That translates into an annual profit of $347,814.00.

## ANALYSIS

The purpose of a discharge in bankruptcy is to "relieve an honest debtor from his financial burdens and to facilitate the debtor's unencumbered fresh start." Miller v. Kasden (In re Kasden), 209 B.R. 239, 241 (B.A.P. 8th Cir. 1997) (quotation omitted). If a debtor is dishonest, the Bankruptcy Code provides mechanisms to deny a debtor's discharge. See 11 U.S.C. § 727(a). "On one hand, the denial of discharge is a harsh result. Section 727 intends to aid the prevention of bankruptcy abuse by debtors. On the other hand, a discharge in bankruptcy and the associated fresh start, are privileges, not rights." McDermott v. Petersen (In re Petersen), 564 B.R. 636, 645 (Bankr. D. Minn. 2017). Because denial of discharge is a harsh remedy, § 727 of the Bankruptcy Code is

construed liberally in favor of the debtor. Korte v. Internal Revenue Service (In re Korte), 262 BR

464, 471 (B.A.P. 8th Cir. 2001). The Plaintiffs have the burden to prove by a preponderance

of the evidence that a discharge to the Debtor should be denied under § 727(a). Allred v. Vilhauer

(In re Vilhauer), 458 B.R. 511, 514 (B.A.P. 8th Cir. 2011).

An objecting party need only satisfy one of the enumerated grounds to support a denial of

discharge by the bankruptcy court. United States Trustee v. Dykes (In re Dykes), 954 F.3d 1157,

1162 (8th Cir. 2020)(citing Union Planters Bank, N.A. v. Connors, 283 F.3d 896, 901 (7th Cir.

2002). The Court will now go through each count in turn.

### I.      Denial of Discharge Under Section 727(a)(2)(A)-(B)

Under § 727(a)(2)(A) of the Bankruptcy Code, a court may deny a discharge if "the debtor,

with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody

of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has

permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor,

within one year before the date of the filing of the petition. Section 727(a)(2)(B) is identical, except

that it applies to "property of the estate, after the date of the filing of the petition." 11 U.S.C.

§ 727(a)(2)(B). Section 727(a)(2) is "fundamental to the concept that a debtor's chapter 7

discharge is granted upon the condition that the debtor has disclosed all of [his] assets and made

them available for distribution." United States Trustee v. Beard (In re Beard), 595 B.R. 274, 289

(Bankr. E.D. Ark. 2018) (cleaned up).

To prevail on their § 727(a)(2) claim, the Plaintiffs must show that: 1) the Debtor's actions

took place within twelve months before the petition was filed for bankruptcy relief, or after the

petition date; 2) the Debtor took the actions with the intent to hinder, delay or defraud a creditor

or an officer of the estate; 3) the Debtor himself took the actions; and 4) the Debtor's actions

consisted of removing, destroying, or concealing property. Georgen-Running v. Grimlie (In re Grimlie), 439 B.R. 710, 716 (B.A.P. 8th Cir. 2010).

Debtor does not dispute that he took actions to remove, destroy, or conceal property. He argued that his actions did not violate § 727(a)(2) because the property was not property of the estate; rather, he claims the property was owned by Birchwood, and he did not take any actions with the intent to hinder, delay or defraud a creditor. The Court does not find the Debtor's arguments persuasive.

Debtor argued that his conduct does not fall under § 727(a)(2) because the assets were owned by Birchwood, and they were not assets of the Debtor. The Plaintiffs argue that § 727(a)(2) applies because Debtor "destroyed" property of the debtor under § 727(a)(2)(A) by: devaluing his equity ownership interest in Birchwood, continuing to alter and delete the business's books and records, and the property of Birchwood Electric is properly treated as property of the Debtor's bankruptcy estate under an "alter ego" theory under Minnesota law.

Debtor argued that his case is like NE. Neb. Econ. Dev. Dist. v. Wagner (In re Wagner), 305 B.R. 472 (B.A.P. 8th Cir. 2004). In that case, the Eighth Circuit B.A.P. found that a transfer of funds belonging to an LLC of which the debtor was a shareholder was not a **transfer** of property of the debtor's estate. Id. at 475-76. The court did not consider or address whether the debtor "**destroyed**" his own individual property by significantly devaluing his ownership shares in the LLC. In fact, there was no devaluation or destruction in *Wagner* at all: to the contrary, the individual debtor there sought to keep the business alive. Unlike the Debtor here, the debtor there used the transferred funds to pay the LLC's operating expenses, "believing that the company had a good chance of surviving the economic downturn if he could keep it afloat." Id. at 474.

Here, Debtor transferred money out of his LLC to diminish its value, lower the DSCR, and to avoid paying his debt to the Plaintiffs. Debtor "destroyed" property of the debtor under § 727(a)(2)(A) by destroying the value of his stock in Birchwood. When a debtor owns shares of stocks in a corporation, upon filing bankruptcy Debtor's shares become property of the bankruptcy estate. Stoebner v. Wick (In re Wick), 276 Fed.3d 412, 415 (8th Cir. 2002) (debtor's unvested stock options that were contingent on her continued employment were property of the estate). The Debtor was the 100% owner of the stock of Birchwood, a once profitable business. Within one year of the petition date, the Debtor intentionally devalued (i.e., destroyed and mutilated) the Birchwood stock by taking equity distributions, siphoning funds, fraudulently manipulating the DSCR, and ultimately closing the business, laying off all employees, and destroying and/or deleting business records, including customer information.

The Debtor thus destroyed his own property—his stock in Birchwood—with the intent to hinder, delay, or defraud creditors—namely, the Plaintiffs. Debtor's actions are more akin to In re McNamara and In re Hintze, where those respective courts found that the debtors in those cases destroyed their own interest in their respective businesses. In Bank of Canton v. McNamara (In re McNamara), 620 B.R. 178, 192-95 (Bankr. D. Mass. 2020), the court denied discharge under materially the same facts. There, as here, the individual debtor intended to hinder and delay the lender by causing his business—and thus his stock interest in the business—to be significantly devalued, i.e., "in effect partially destroyed or removed." The court held that the debtor's dissipation of the value of his stock constituted the destruction or removal of his property under § 727(a)(2)(A). Id. Similarly, in Spence v. Hintze (In re Hintze), 570 B.R. 369, 387-88 (Bankr. N.D. Fla. 2017), aff'd, No. 1:17cv18-MCR/GRJ, 2018 WL 10879105, at *6 (N.D. Fla. Mar. 26, 2018), the court denied discharge because the individual debtors "destroyed" their 100% ownership

interest in an LLC by transferring nearly all the LLC's assets to another entity. The bankruptcy court reasoned, in a holding expressly adopted on appeal: "If one can 'destroy' a reputation, then it stands to reason that one can destroy the value of a membership interest in an LLC." 570 B.R. at 388. See also Villa Oaks, LLC v. Shakir (In re Shakir), 623 B.R. 532, 540 (Bankr. N.D. Ill. 2021) ("[E]ven though a businessman-debtor might only own the shares of a company he controls rather than its assets . . . a debtor's fraudulent manipulation of the assets or cashflows of his business may come within the scope of Section 727(a)(2)."). Here, the Debtor himself owned and controlled Birchwood. By looting Birchwood's assets, the Debtor destroyed his ownership interests in Birchwood—which were "property of the debtor" by statute. The Debtor took these actions intending to defraud the Plaintiffs, thereby hindering their ability to collect the debt lawfully owed to them. The evidence at trial showed this intent in multiple ways. The Debtor intentionally manipulated the DSCR with the specific purpose of avoiding making loan payments to Plaintiffs. And the Debtor intentionally devalued the business with the specific purpose of hindering Plaintiffs' ability to collect on the debt. The stock (*i.e.*, Plaintiffs' collateral) is now worth nothing, while the Debtor has a new electrical contracting business–Edge Electric–built from the goodwill of Birchwood, but one that is notably unencumbered by his obligations to Plaintiffs.[5]

All of Debtor's above actions with Birchwood were taken to decrease the DSCR and thereby avoid paying his personally guaranteed debt to the Plaintiffs. He also threatened multiple times to file for bankruptcy if Plaintiffs did not accept his "settlement" offers. The Debt to the

---

[5]    In May of 2022, Debtor formed a new company, Edge Electric, which does the same work as Birchwood, and serves many of the same clients.

Plaintiffs is Debtor's only significant debt and the Court believes was the sole reason Debtor filed bankruptcy.

The Court finds that Burg's destruction of the property of Birchwood is destruction of property of the estate.

To deny his discharge under § 727(a)(2)(A), the Debtor must also have acted with the necessary intent to hinder, delay, or defraud the Debtor's creditors. "Proving the requisite actual intent with direct evidence is difficult. Thus, such actual intent may be inferred from the facts and circumstances of the debtor's conduct." In re Korte, 262 B.R. at 472-73. "Fraudulent intent may be established by showing that the debtor knowingly made an omission that misleads the trustee or that the debtor engaged in a fraudulent course of conduct." In re Kasden, 209 B.R. at 244. "A debtor's intent may be inferred from all the surrounding circumstances where the debtor's pattern of conduct supports a finding of fraudulent intent. The focus is on whether the debtor's actions appear so inconsistent with his self-serving statement of intent that the proof leads the court to disbelieve the debtor." Fokkena v. Klages (In re Klages), 381 B.R. 550, 553 (B.A.P. 8th Cir. 2008). Determining "fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor." United States Trustee v. Govani (In re Govani), 509 B.R. 675, 683 (Bankr. N.D. Iowa 2014) (cleaned up).

The assessment of a witness's credibility may draw on an evaluation and content of the testimony, changes in the witness's demeanor, and the Court's experience, along–with other considerations." Velde v. Thiel (In re Thiel), 579 B.R. 527, 533-34 (Bankr. D. Minn.) aff'd, 587 B.R. 92 (B.A.P. 8th Cir. 2018).

The Court finds the Debtor's testimony lacked credibility. Throughout trial and at his section 341 meeting testimony, Burg was vague, misleading, evasive, ever-changing, and

equivocal. Additionally, Debtor was routinely contradicted on key points, not just by the extensive documentary evidence, but by the testimony of the Debtor's own witnesses. The Court's adverse credibility findings as to the debtor in <u>Thiel</u> apply equally to the Debtor here: the testimony of the Debtor when viewed against the rest of the record belies his credibility. "Indeed, the debtor's testimony exited the bounds of credulity. His representations conflicted with his [previous] representations, which, in turn, left the sincerity of his statements in unacceptable doubt. In other words, the debtor lacked credibility." <u>Id</u>. at 534.

As detailed in the findings discussed earlier, the Court finds that the Debtor acted with fraudulent intent in transferring, removing, destroying, and concealing Birchwood's assets and business/financial records. The Debtor's actual pattern of conduct overwhelmingly supports a finding of fraudulent intent. The Debtor transferred, removed, destroyed, or concealed Birchwood's assets and business/financial records in order to: 1) manipulate the DSCR; 2) deplete Birchwood's assets; 3) divert Birchwood's assets to himself, Rodenwald, Rodenwald's affiliates, and Grubworm; 4) avoid paying the Plaintiffs amounts due and owing under the note; and 5) conceal the evidence of his fraudulent scheme.

The following affirmative acts of the Debtor evidence his fraudulent intent:

a.  The Debtor removed and destroyed physical records and customer files at Birchwood's office.

b.  The Debtor deleted and modified QuickBooks references related to traded services or free services with Wade Rodenwald, and other friends and family, and concealed his conduct from the chapter 7 trustee.

14

c.  The Debtor modified QuickBooks records to remove and alter references to transfers made to himself, his spouse, and Rodenwald, to conceal his fraudulent scheme to avoid paying the Plaintiffs amounts due and owing under the note.

d.  The Debtor deleted the books and records maintained on Google Drive and Google Calendar.

e.  The Debtor drained Birchwood of cash by making payments to Consulting By Wade.

f.  The Debtor, or his spouse–acting as directed by the Debtor, voluntarily drained Birchwood of cash in the lead up to filing for bankruptcy by paying for personal expenses through Birchwood or by issuing severance payments and refunding customers in preparation for bankruptcy.

g.  The Debtor intentionally destroyed the value of his own Birchwood stock by taking equity distributions, siphoning funds, fraudulently manipulating the DSCR, and ultimately closing the business, laying off all employees, and destroying business records, including customer information.

The Court finds by a preponderance of the evidence all elements for denial of discharge under § 727(a)(2)(A) have been met, and Debtor is not entitled to a discharge of his debts to the Plaintiffs under § 727(a)(2)(A).

## II.    Denial of Discharge Under Section 727(a)(2)(B)

The same reasoning underlying § 727(a)(2)(A) applies to § 727(a)(2)(B), except the conduct must occur *after* Debtor filed his petition. See 11 U.S.C. § 727(a)(2)(B). Independent of the Debtor's pre-petition misconduct, the Debtor's post-petition destruction and alteration of books and records also warrants a denial of discharge under § 727(a)(2)(B). "Whereas Section 727(a)(2)(A) encompasses debtor's prepetition acts, Section 727(a)(2)(B) covers any post-petition

acts by a debtor to transfer or conceal property of the estate." <u>RES-GA Diamond Meadows, LLC v. Robertson (In re Robertson)</u>, 576 B.R. 684, 707 (Bankr. N.D. Ga. 2017) (cleaned up).

When the Debtor closed the business, any remaining property of Birchwood—here, certain of its books and records—became property of the Debtor's estate. Debtor destroyed the following property of the estate after he filed his petition: immediately after filing the petition in May 2022 and through July 2022, the Debtor then continued to remove or alter those remaining books and records to hide the evidence of his prior misconduct, self-dealing, siphoning of funds, and manipulations of the DSCR. This conduct on its own warrants a denial of discharge under § 727(a)(2)(B).

Therefore, Debtor's discharge is also denied under § 727(a)(2)(B).

## III.   Denial of Discharge Under Section 727(a)(3)

Under § 727(a)(3) of the Bankruptcy Code, a bankruptcy court will not grant the debtor a discharge if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). The purpose of this section "is to give the trustee, creditors, and the court complete and accurate information concerning the status of the debtor's affairs and financial history, and to test the completeness of the disclosure requirements to a discharge." <u>Miller v. Pulos (In re Pulos)</u>, 168 B.R. 682, 690 (Bankr. D. Minn. 1994). "This provision makes the privilege of discharge dependent on a true presentation of the debtor's financial affairs." <u>In re Dykes</u>, 954 F.3d at 1162 (cleaned up).

The Plaintiffs must present a prima facie case showing that the debtor failed to maintain and preserve adequate records, and his failure to do so makes it impossible to accurately determine

Debtor's financial condition. In re Dykes, 954 F.3d at 1163. The test is whether there is available written evidence from which the present financial condition of the Debtor and his business transactions for a reasonable period may be determined. Id. The debtor is required to take steps to enable the creditors to learn what he did with his estate." Id. If plaintiffs meet their initial burden, "the burden of production shifts to the debtor to offer a justification for his record keeping (or lack thereof); however, the objecting party bears the ultimate burden of proof with respect to all elements of this claim." U.S. Trustee v. Swanson (In re Swanson), 467 B.R. 236, 240 (B.A.P. 8th Cir. 2012).

"In determining whether a debtor's record keeping was justified, the Bankruptcy Code requires the trier of fact to make a determination based on all the circumstances of the case." In re Dykes, 954 F.3d at 1163. For this inquiry, this Court "must first determine what records someone in like circumstances to [the Debtor] would keep." In re Sendecky, 283 B.R. 760, 764 (B.A.P. 8th Cir. 2002). "The more complex the debtor's financial situation, the more numerous and detailed the debtor's financial records are supposed to be." In re Pulos, 168 B.R. at 692.

The Court finds that the Debtor failed to maintain and preserve adequate records under any objective standard. Among other things:

a. Both before and after the petition date, the Debtor concealed, destroyed, mutilated, falsified, or failed to keep or preserve the business and financial records of Birchwood from which the Debtor's financial condition or business transactions might have been ascertained.

b. The Debtor intentionally destroyed or failed to keep or preserve records contained in Birchwood's Google Drive, Google Calendar, and emails. Google Drive and Google Calendar were free services utilized by the Debtor and would have included sufficient

information for the trustee and creditors to ascertain the financial condition of the

Debtor and business transactions of Birchwood.

c.  The Debtor intentionally destroyed, or failed to keep or preserve, paper records of

Birchwood including completed and in-progress work orders. The paper records would

have provided the financial condition and business transactions of the Debtor and were

stored in an office space Birchwood paid to maintain for two months following the

Debtor's bankruptcy petition. The paper records were either wrongfully removed or

destroyed by the Debtor or were not adequately preserved by the Debtor.

d.  The Debtor intentionally deleted QuickBooks customer account information and

records of payment, including Venmo statements requested by the chapter 7 trustee,

which would have permitted the trustee and the Debtor's creditors to ascertain his

financial condition or business transactions.

e.  The Debtor maintained almost no records of Grubworm's real estate transactions,

including purchases, sales, and loans. The records that the Debtor did provide were

riddled with inaccuracies. For example, both the Debtor's and Grubworm's tax returns

contained multiple false statements and omissions about Grubworm's assets, liabilities,

and revenues. The Debtor's own witness, Rodenwald, testified that the Debtor's and

Grubworm's tax returns wrongly claimed losses and expenses related to Grubworm to

which the Debtor was not entitled.

Debtor's acts or failures to act were not justified under the circumstances of the case: they

began while a lawsuit was ongoing, and the Debtor was represented by counsel and continued even

after the bankruptcy filing. See In re Dykes, 954 F.3d at 1163 (finding that debtors failed to keep

adequate record of asset transfer where, at the time, they were considering bankruptcy and had

multiple judgment creditors in enforcement proceedings) (citing cases nationwide). Instead, the Debtor, for the same reasons as listed under § 727(a)(2), acted with intent to conceal the evidence of his fraudulent scheme.

Debtor admitted that he deleted and failed to maintain several types of records which would be relevant to ascertain the financial status of Debtor and his LLCs. He also admitted to deleting or not getting paid for several jobs that Birchwood did for others.  It is interesting to note that Debtor acknowledged that he now gets paid by these very same customers when doing work for them through his new electric company, Edge Electric.

Therefore, Debtor's discharge is also denied under § 727(a)(3).

## IV.    Denial of Discharge Under Section 727(a)(4)(A)

A bankruptcy court will not grant the debtor a discharge if "the debtor knowingly and fraudulently, in or in connection with the case (A) made a false oath or account; (B) presented or used a false claim; . . .  or (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs." 11 U.S.C. § 727(a)(4). "It is crucial to the effectiveness of the bankruptcy system that the Debtor proceed with complete candor. The Trustee should not be required to conduct his own investigation to discover the facts." Kaler v. Charles (In re Charles), 474 B.R. 680, 686 (B.A.P. 8th Cir. 2012). For this reason, § 727(a)(4)(A) "requires nothing less than a full and complete disclosure of any and all apparent interests of any kind. The debtor's petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts." In re Korte, 262 B.R. at 474.

The Court may deny the discharge of a debtor if he "knowingly and fraudulently, in or in connection with the case—made a false oath or account." 11 U.S.C. § 727(a)(4)(A). To prevail, the Trustee must prove: "(1) the Debtor made a statement under oath; (2) the statement was false; (3) the Debtor knew the statement was false; (4) the Debtor made the statement with fraudulent intent; and (5) the statement related materially to the Debtor's bankruptcy case." In re Charles, 474 B.R. at 684 (quotation omitted).

The debtor is required to verify the information in his bankruptcy schedules and petition under the penalty of perjury. Sullivan v. Bieniek (In re Bieniek), 417 B.R. 133, 138 (Bankr. D. Minn. 2009). The debtor's signature "has the force and effect of an oath." Cepelak v. Sears (In re Sears), 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000). "Statements made with reckless indifference to the truth are regarded as intentionally false," and "fraudulent intent may be established by circumstantial evidence." In re Charles, 474 B.R. at 684.

To support denial of discharge, "the false statement must be material." Mertz v. Rott, 955 F.2d 596, 598 (8th Cir. 1992) (quotation omitted). "[T]he threshold to materiality is fairly low." In re Charles, 474 B.R. at 686. A statement is material "if it bears a relationship" to the debtor's "business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." Id. (quotation omitted).

Debtor made the following false oaths and statements in the course of his bankruptcy proceeding:

a. The Debtor made false statements at the initial 341 meeting when he denied deleting or modifying QuickBooks entries or that he directed Mrs. Burg to do so before the petition date.

b.   The Debtor made false statements at the continued 341 meeting when he denied deleting or modifying QuickBooks entries after the petition date.

c.   The Debtor made false statements in the petition and the initial 341 meeting when he stated that the purpose and business of Grubworm was as a "trenching company," even though, at all times, Grubworm was a real estate investment and "house flipping" enterprise.

d.   The Debtor made a false statement in the petition when he listed the value for his 50% interest in Grubworm at $15,000, even though, as of the petition date, Grubworm owned real estate valued at far more.

e.   The Debtor made false statements at the initial 341 meeting and the continued 341 meeting when he denied causing Birchwood to provide free services or trades to Rodenwald and the contractors who performed work on his homestead.

Debtor made multiple contradictory statements throughout the entire bankruptcy process. For example, at his 341 meeting, Debtor denied deleting QuickBooks entries or directing his wife to do so. He also denied directing Birchwood to provide free services or trades to Rodenwald, Grubworm, and properties owned by family members and friends. At trial, he admitted to deleting multiple QuickBooks entries and admitted to the "trades" occurring.

Debtor made multiple contradictory and false statements regarding Grubworm. He constantly changed his testimony regarding the primary purpose of Grubworm: was it trenching, was it house flipping, or was it just another source of income? He also stated that Grubworm was worth only $15,000.00 in his petition.  Yet, in spite of the fact the records were incomplete and/or inconsistent, it is abundantly clear that at the time of the filing, Grubworm owned multiple properties, and the collective value of them far exceeded the amount claimed in the petition.

As noted previously, the Court does not find Debtor credible. He continuously lied, changed his story, and misled the trustee and the Court regarding the status of his estate and actions. Debtor made the above false statements with reckless disregard for the truth. All these statements were material to Burg's bankruptcy because they related to the content and assets of the estate.

Therefore, Debtor's discharge is also denied under § 727(a)(4)(A).

## V.      Denial of Discharge Under Section 727(a)(4)(D)

Section 727(a)(4)(D) authorizes the court to withhold a discharge of all of a debtor's debts when the debtor knowingly and fraudulently, in or in connection with the case, withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs. 11 U.S.C. § 727(a)(4)(D). A debtor "knowingly and fraudulently withholds records when the failure to produce requested records is an attempt to hide assets or impede the trustee." Strauss v. Brown (In re Brown), 531 B.R. 236, 265 (Bankr. W.D. Mo. 2015)(quotation omitted). The phrase "knowingly and fraudulently. . . requires that the debtor's actions must have been taken with the intent to defraud the trustee or be so reckless as to justify a finding that the debtor acted fraudulently." Gargula v. Lombard (In re Lombard), 446 B.R. 344, 349 (Bankr. W.D. Mo. 2010) (analyzing phrase as it is used in § 727(d)(2)).

Debtor's withholding of records is intertwined with his deleting of records and his attempts to mislead the court on what he did with his assets. Debtor did not disclose the full nature and extent of his interest in properties owned by Birchwood.

Therefore, Debtor's discharge is also denied under § 727(a)(4)(D).

22

## VI.    Denial of Discharge Under Section 727(a)(5)

Under § 727(a)(5) of the Bankruptcy Code, a bankruptcy court shall not grant the debtor a discharge if "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). The purpose of § 727(a)(5) "is to require the debtor to cooperate with the trustee and creditors in their efforts to trace the disposition of assets of the estate." Bailey v. Whitehead (In re Whitehead), 483 B.R. 902, 909 (Bankr. E.D. Ark. 2012). Under § 727(a)(5), "the assets may include a debtor's interest in business entities or the assets of the business." Vucurevich v. U.S. Bank Nat'l Ass'n, Civ. 14-4115-KES, 2015 WL 632137 (D.S.D. Feb. 13, 2015) (citing cases).

"The party objecting to a debtor's discharge pursuant to § 727(a)(5) has the burden of proving facts establishing that a loss or shrinkage of assets actually occurred." In re Sendecky, 283 B.R. at 766. If this burden is met, then the burden shifts to the debtor to provide a "satisfactory" explanation for the loss or shrinkage of assets." Id. "If the explanation is too vague, indefinite, or unsatisfactory then the debtor is not entitled to a discharge. The explanation given by the debtor must be definite enough to convince the trial judge that assets are not missing." In re Vilhauer, 458 B.R. at 514 (citations and internal quotations omitted). "Unsubstantiated, uncorroborated and undocumented testimony from the debtor is not likely sufficient." Id. at 514-15.

Debtor, specifically through his 100% interest in Birchwood, failed to explain the following losses and transfers of assets: $217,000 in transfers from Birchwood to himself; $136,000 in transfers from Birchwood to his wife; information regarding his personal Venmo account; rent derived from the Osakis property; and losses to Grubworm in favor of Mr. Rodenwald on the sales of properties. The Debtor did not offer a credible explanation regarding

any of the assets, let alone provide substantiation, corroboration, or documentation necessary for the chapter 7 trustee and the Plaintiffs to trace these assets.

Debtor has not convinced the Court that these assets are not missing. In fact, Debtor only left the Court with more questions about his assets than answers. Plaintiffs have proven by a preponderance of the evidence that Debtor is not eligible for a discharge under § 727(a)(5). Therefore, Debtor's discharge is also denied under § 727(a)(5).

## VII.    Exception to Discharge Under Section 523(a)(6)

Because the Court has determined that the Debtor is ineligible to receive his discharge under each of the four counts alleging a violation of § 727, the Court need not decide whether 11 U.S.C. § 523(a)(6) applies.

## VIII.    Attorneys' Fees

The Court now turns to Plaintiffs' request for attorneys' fees. The note for the debt owed to the Plaintiffs states: "Should any default occur in the payment set forth above, the undersigned agrees that he shall be responsible for reasonable attorneys' fees, together with court costs, if placed in the hand of an attorney for the purposes of collection." (Stip. Facts ¶ 12; Ex. 3). On January 1, 2017, Debtor defaulted on his payments to Plaintiffs and remains in default. Minnesota law allows an award of attorney's fees and court costs as long as the documents such recovery and the fees are reasonable. State Bank of Cokato v. Ziehwein, 510 N.W.2d 268, 270 (Minn. Ct. App. 1994) rev. denied (Minn. Mar. 15, 1994).

A prevailing party is allowed a recovery of attorneys' fees even when litigating contract-based claims in bankruptcy court. Travelers Cas. Sur. Co. of Am. v. Pac. Gas and Elec. Co., 549 U.S. 443, 448-54 (2007); See also, Green Tree Servicing, LLC v. Coleman (In re Coleman) 392 B.R. 767, 771 (B.A.P. 8th Cir. 2008).

Therefore, Plaintiffs are entitled to file a motion for reasonable attorney's fees, expenses, and court costs. See Fed. R. Bank. P. 7054; Fed. R. Civ. P. 54(d)(2)(A)-(C).  Counsel for Plaintiffs, within 14 days of the date of entry of this order, shall prepare an itemized breakdown of fees and expenses and serve Defendant's counsel, who shall have 10 days to file any objections thereto. The Court will take up the Plaintiffs' motion in due course.

## CONCLUSION AND ORDER FOR JUDGMENT

For the foregoing reasons, a judgment will enter in favor of the Plaintiffs and against the Defendant as follows:

1. Denying the Defendant's discharge under 11 U.S.C. § 727(a)(2), (a)(3), (a)(4), and (a)(5);

2. Mooting the Plaintiffs' claim that the debt owed by the Defendant to the Plaintiffs be excepted from the Defendant's discharge under 11 U.S.C. § 523(a)(6); and

3. Permitting the Plaintiffs to file a motion for approval of attorney's fees and costs incurred in this proceeding.

## LET JUDGMENT BE ENTERED ACCORDINGLY.

*/e/ Michael E. Ridgway*
Michael E. Ridgway
United States Bankruptcy Judge